WALTER J. ROTHSCHILD, Judge.
|aOn February 28, 2002, a Jefferson Parish Grand Jury indicted defendant, Corey Miller, also known as C-Murder, for second degree murder, in violation of LSA-R.S. 14:30.1. A jury trial commenced on August 3, 2009,[1] and a 12-person jury found defendant guilty as charged on August 11, 2009.[2] On August 14, 2009, defendant was sentenced to life imprisonment to be served with the Department of Corrections, without benefit of parole, probation, or suspension of sentence.

FACTS

Deputy Brian Singleton of the Jefferson Parish Sheriffs Office was patrolling in the *183 early morning hours of January 12, 2002, when he received a call that shots had been fired inside of the Platinum Club, which was located on Manhattan Boulevard. When he arrived, he observed a large crowd of between 75 and 150 people who were screaming and exiting the club in a “hectic state.”
|4Peputy Singleton made his way through the crowd and observed approximately 100 or 200 patrons inside the club. He also saw the victim, 16-year old Steve Thomas, who was lying on his back after suffering a single gunshot wound to his chest. Although Deputy Singleton tried to speak to him, the victim was unable to communicate. Deputy Singleton called for medical assistance.
The doors to the club were locked. Deputy Singleton and other deputies obtained the names, telephone numbers, and addresses of the remaining patrons and asked if they had any information concerning the incident or the shooter. Deputy Singleton testified that all of the people he spoke to advised him that they did not see anything. He believed that the incident happened around 1:30 a.m.
Darnell Jordan testified that he worked in security at the Platinum Club and was on duty at the time of the shooting. He recalled that defendant was at the club. Darnell testified that a fight broke out between the pool table and the dance floor and that 15 or 20 people were beating one person. The victim was lying on his back, trying to cover himself while he was getting kicked and punched. Darnell said that he ran to try to break up the fight. He said that he grabbed defendant and told him to “chill out.” He said that defendant responded “alright,” but then tried to make his way through. Thereafter, one gunshot was heard. He did not see defendant strike the victim with his foot or his fist, but believed he was trying to get into the fight. Darnell testified that he was about one yard away when he saw defendant reach his hand into the pile of people. He saw the gun flash from the end of defendant’s arm. He testified that although he never saw defendant with a gun, he assumed that whatever flashed was in his hand. He believed that there were between 250 and 300 people in the club, but some had run out of the club after the shooting, including defendant and the individuals involved in the fight. Darnell called 9-1-1, but he did not identify the shooter.
IfiDarnell testified that a few minutes after the shooting, he told Detective Kevin Nichols of the Jefferson Parish Sheriffs Office that the shooter- was C-Murder. He explained that he knew and trusted Detective Nichols, who worked as a detail officer for the club. He further testified that he had no doubt that defendant shot the victim. However, he admitted that at times during the investigation, he denied knowing who the shooter was. He explained that he was scared because he feared retaliation from defendant and his “clique.”
Darnell testified that he later received a phone call from one of the club owners and was told something that caused him to be concerned for his life. Because he was afraid of defendant, he called Detective Nichols. On January 17, 2002, Darnell met with Detective Nichols, Detective Donald Clogher and Lieutenant Thurman and told them that defendant was the shooter. He identified defendant in a photographic lineup as the person who killed Steve Thomas. Darnell explained that he was testifying because the victim’s father lost his son, and it was the right thing to do.
Detective Nichols testified that he was working a detail in the parking lot of the Platinum Club at the time of the shooting. *184 He observed people leaving in a hurried manner, so he thought there must have been a fight. However, when he got to the entry doors, he was told there had been a shooting. Detective Nichols entered the club and observed the victim lying on his back. Detective Nichols testified that he talked to Darnell, who worked in security at the club, and he told the detective that he saw C-Murder shoot the victim. Detective Nichols said that he collected 25 to 30 names on the scene, but no one admitted seeing anything.
Detective Donald Clogher of the Jefferson Parish Sheriffs Office was notified of the shooting at the Platinum Club, and he was ultimately given the primary responsibility for the investigation. He believed that between 100 and 150 | (¡people were still in the club when he arrived. During the investigation, Detective Clogher approached Darnell and asked him about what he had seen. Darnell placed defendant in the immediate vicinity of the murder, but did not name defendant as the shooter. Darnell was transported to the Detective Bureau and was interviewed further, but he said the same thing.
Other witnesses were taken to the Bureau that night as well. According to Detective Clogher, Denise Williams said she witnessed the murder and identified the shooter as Derrick Taylor. Denise was concerned that she had been pointed out as a witness and was upset when Detective Clogher met with her. Detective Clogher believed Denise was being untruthful, and she later admitted that she lied about her identification of the shooter. However, she was not arrested, because Detective Clogher believed she was untruthful due to concerns for her own safety, not to mislead the investigation.
Detective Clogher testified that on January 17, 2002, he took a statement from Darnell, and Darnell identified defendant as the shooter in a photographic lineup. An arrest warrant was obtained on January 18, 2002, and defendant was arrested. Defendant was read his rights and agreed to make a statement, but was not willing to give a recorded statement. He admitted that he was at the Platinum Club and stated that at the time of the incident he was speaking with the D.J. Defendant told Detective Clogher that he heard the gunshot and was immediately pushed out of the club by an unknown individual. Defendant asked the detective about the investigation, the level of cooperation the police was receiving from witnesses, and who had identified the shooter. He believed defendant was fishing for the identification of the witnesses to see if they had been “threatened out of cooperating.” Defendant proclaimed his innocence to Detective Clogher. Detective Clogher testified that defendant gave statements that were contradicted l7on numerous occasions throughout the investigation. Detective Clogher did not feel defendant was cooperating and felt defendant was lying.
Kenneth Jordan testified that he was at the Platinum Club on January 12, 2002, and that defendant was at the club with 10 to 15 people. He explained that the club let celebrities in first and allowed them to go past the line. He recalled that a metal detector wand was used on him that night, but defendant and his group went through without being checked. He recalled that there was a rap contest that night and the victim exited the stage after he rapped. He said that a person wearing a “CP3” hoodie ran into the victim and then attacked him. Kenneth explained that CP3 stands for the Calliope Project and identified the gang sign in a photograph of defendant. Kenneth testified that the victim was fighting for his life when the CP3 group of six or seven people attacked him. *185 He stated that defendant did not throw any punches, but was watching the fight.
Kenneth testified that after the fight was over, he was about five or six feet from defendant when defendant stood over the victim and shot him once. He said the shot rung his ears, and he saw the fire come from the gun. Kenneth said he ran out of the club behind the group and defendant. Kenneth did not talk to the police at the time or contact the police, because he was scared for his life. He had heard what defendant’s “people” could do and what was happening to people in jail.
About a year after the murder, the case was mentioned when Kenneth was at the Detective Bureau as a material witness regarding the death of his baby. It was learned that Kenneth was at the Platinum Club at the time of the shooting. On January 27, 2008, Detective Clogher interviewed Kenneth, took his statement, and showed him a photographic lineup. Kenneth identified defendant as the shooter. He explained that at that point he wanted to tell the truth because he knew how it |8felt to lose a child. Kenneth identified defendant in court and testified he was positive that defendant shot Steve Thomas.
The victim’s father, George Thomas, testified that the victim liked rap music and had posters all over his room of different rappers, mostly of the Miller brothers— Master P, C-Murder, and Silk. The victim wanted to be a rapper. His father did not know his son was going to the Platinum Club, but instead believed he had gone to a movie. However, around 1:00 a.m., he received a call from a bouncer at the Platinum Club who said his son had been shot. At the hospital, a doctor eventually told him that they could not save his son.
The taped testimony of Kirk Edwards was presented. Kirk was the DJ at the Platinum Club at the time of the shooting. He had seen defendant a couple of times before, and identified him in court, but he denied seeing defendant in the Platinum Club on the night of the incident. After seeing a disturbance across the dance floor, Kirk turned on the lights and then the gunshot went off. Kirk testified that he could not say if defendant was involved in the fight, but at no time during the night did defendant come up to the DJ booth to talk to him.
Defendant presented the taped testimony of Keshawn Scott. Keshawn testified that she was in the club when the victim was shot. She said she was close to the fight and recalled that a lot of people were kicking and stomping on the victim. She said after the “pang” from the gun, everyone ran and she left prior to when the club was locked. It was not until after the gunshot that the lights were turned on. She said she had no idea where defendant was at the time of the fight, but he was not one of the people involved in the fight. She testified that she did not see the shooter, but she knew defendant was not the shooter.
Defendant also presented the taped testimony of Vance LaFrance, who stated that he was at the Platinum Club at the time of the shooting. He saw | defendant at the club before and during the fight. He said defendant was tall and was a celebrity, so he really could not be missed, even though there were 500 to 600 people in the club. Vance testified that he saw 12 to 15 men in hip hop clothes punching, kicking, and stomping one man on the dance floor. He said the men did not have CP3 on their clothing. He said he did not recognize the people fighting, but knew that defendant was not fighting. Vance said he heard when the gunshot was fired, but did not see who fired it. After the shot was fired, people rushed out of the club, but he was not able to get out. He *186 told the police that he was in the bathroom, even though he was not in the bathroom, because he did not see the shooter. He testified that he had no doubt that defendant did not shoot the victim.
Defendant also presented the taped testimony of Vanessa Henry, who said she was at the Platinum Club at the time of the shooting. She knew defendant, and he was at the club that night. She testified that the victim got into a fight with a group a couple of feet away from her. When the fight started, she backed up and defendant was right behind her. Defendant grabbed her by her waist to move her to the side and that is when the shot went off. She testified that defendant was not involved in the fight, but she believed the people who were fighting were with defendant. She testified that the people in the fight were yelling out “Calliope,” which referred to the Calliope Housing Project, where defendant was from. They also yelled “CP-3” which meant Calliope Project, Third Ward. She also showed the sign that some of them made. She identified defendant in a photograph with someone whom she could not identify, and said they were making the Third Ward signs in the photograph.
After the shot was fired, Vanessa saw defendant and the group that had been fighting run out of the door. Vanessa tried to leave, but security locked her in the Imclub. She told the police that she did not see anything because she was nervous. She testified that she had no doubt that defendant did not shoot the victim.
Defendant also played the tape of Hash-im Smith, who was at the Platinum Club on the night of the incident. Hashim testified that defendant was inside the DJ booth and that the DJ was announcing C-Murder and talking about his album. Hashim observed the fight, but did not hear anyone yelling CP-3 or Calliope. Hashim explained that the victim had been dancing close with a female, and he thought this must have been what the fight was over. Hashim stated that the victim was on the ground and was getting stomped on by a group, and then someone in the middle leaned in and shot the victim. Hashim did not see the shooter’s face, but he did see the shooter’s profile, and he was 100 percent certain that defendant was not the shooter. Hashim did not know where defendant was during the shooting, but knew where he was not.

LAW AND DISCUSSION

In his first assignment of error, defendant argues that prejudicial and unsubstantiated allegations that he threatened witnesses and obstructed the investigation require reversal. He asserts that he was denied due process of law because the introduction of unduly prejudicial and baseless bad acts evidence infused the trial with unfairness. He contends that the State failed to meet the steps of LSA-C.E. art. 404(B)(1), and the judge failed to make the findings necessary pursuant to Article 404(B)(1).
First, defendant argues that the uncharged allegations that he threatened witnesses and impeded the investigation do not tend to prove a “material issue” or possess “independent relevance.” He explains that Darnell Jordan and Kenneth Jordan both testified that they did not cooperate fully with detectives out of fear that defendant would retaliate against them. He also argues that Detective Clo-gher |umade reference to generalized future threats and suggested that defendant had already rendered threats and was fishing for information as to which witnesses were cooperating. Defendant argues that the three conceivable purposes for introducing this bad acts evidence were to suggest that defendant’s attempt to manipulate the investigation and threat *187 en witnesses proved his guilt, to insinuate that defendant is characteristically prone to violence, or to justify the absence of evidence against defendant by blaming him for impeding the investigation.
Defendant further argues that the prosecution did not prove by clear and convincing evidence that defendant threatened anyone. Further, defendant contends that bad act allegations that were introduced via hearsay evidence denied him his right to confront witnesses. He argues that the State failed to meet the two-step Crawford [3] test for admitting hearsay, as well as the three-step test for admitting bad acts evidence.
Finally, defendant argues that the State made numerous references to uncharged, unsupported, and unduly prejudicial bad acts evidence during its closing arguments. Noting that the State failed to introduce any independent evidence that defendant intimidated anyone, defendant contends that the State’s comments about witness intimidation were impermissible references to bad acts that mandated a mistrial.
Generally, evidence of other crimes or bad acts committed by a criminal defendant is not admissible at trial. LSA-C.E. art. 404(B)(1); State v. Davis, 08-165, p. 14 (La.App. 5 Cir. 7/29/08) 993 So.2d 295, 303, writs denied, 08-2188 (La.5/1/09), 6 So.3d 810 and 08-2200 (La.5/1/09), 6 So.3d 811. However, when evidence of other crimes tends to prove a material issue and has independent | ^relevance other than to show that the defendant is of bad character, it may be admitted by certain statutory and jurisprudential exceptions to this rule. State v. Dauzart, 02-1187 (La.App. 5 Cir. 3/25/03), 844 So.2d 159, 165. Evidence of other crimes is allowed to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding to such an extent that the State could not accurately present its case without reference to the prior bad act. Id.; LSA-C.E. art. 404(B)(1).
In order for other crimes evidence to be admitted under LSA-C.E. art. 404(B)(1), one of the factors enumerated in the article must be at issue, have some independent relevance, or be an element of the crime charged. State v. Jackson, 625 So.2d 146, 149 (La.1993). Further, the probative value of the extraneous evidence must outweigh its prejudicial effect. LSA-C.E. art. 403.
The defendant bears the burden to show that he was prejudiced by the admission of the other crimes evidence. Davis, 08-165 at 14, 993 So.2d at 303. Absent an abuse of discretion, a trial court’s ruling on the admissibility of evidence pursuant to LSA-C.E. art. 404(B)(1) will not be disturbed. State v. Williams, 02-645 (La.App. 5 Cir. 11/26/02), 833 So.2d 497, 507, writ denied, 02-3182 (La.4/25/03), 842 So.2d 398.
A mistrial is a drastic remedy and, except in instances in which a mistrial is mandatory, is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial. Davis, 08-165 at 17, 993 So.2d at 305. Whether a mistrial should be granted is within the sound *188 discretion of the trial court and the denial of a motion for mistrial will not be disturbed absent an abuse of that discretion. Id.
LSA-C.Cr.P. art. 770 provides, in pertinent part, the following:
| isUpon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
* * *
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible[.]
* * *
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
As a general rule, LSA-C.Cr.P. art. 770 does not apply to testimony by a State witness, since a witness is not considered a “court official.” However, an impermissible reference to another crime deliberately elicited by the prosecutor is imputable to the State and triggers the rule mandating a mistrial. State v. Thomas, 08-113, p. 9 (La.App. 5 Cir. 6/19/08), 988 So.2d 750, 756.
In the present case, defendant complains about Darnell’s testimony that Darnell lied when he said he did not know who the shooter was because he feared defendant and his “clique” would come looking for him. Defense counsel objected and argued that it was speculation. The State responded that it went toward his state of mind, and the trial judge said he would allow him to cross-examine the witness regarding these comments. Darnell made further comments about being afraid of defendant. He testified that he contacted Detective Nichols after receiving a phone call. Defense counsel objected, anticipating hearsay and other bad acts regarding the phone call. The State responded that it was not hearsay because it did not go to the truth of the matter asserted and added that it explained why the witness changed his story back to its original version. The judge decided that if he said he had received a telephone call and was told things, it would not be hearsay. Defense counsel agreed and said the judge was right.
| uDefendant also complains that Darnell testified that he was carrying a gun for protection because he feared retaliation after testifying against defendant in the first trial. The record reflects that Darnell agreed that after he testified at the first trial, he was “picked up” for carrying a gun and marijuana. He said he carried the gun for protection. Defendant did not object. Later in rebuttal, Darnell was asked again by the State why he was carrying a gun, and he answered for protection. The State asked, “[protection from what?” Defendant objected, and a bench conference was held. Defense counsel moved for a mistrial because the question and answer were “gratuitous.” The trial judge said “[n]o.” Darnell then explained that he believed he needed protection because he had testified in the first trial. Defense counsel asked for a continuing objection, and the court agreed. Defense counsel reurged his motion, and the trial court denied it.
Based on our review of the testimony, we find that the trial court did not err in overruling defendant’s objections or his motions for mistrial in regard to Darnell’s testimony. Darnell explained that at first he did not admit who the shooter was *189 because he feared defendant and his “clique” would come looking for him. This testimony revealed Darnell’s state of mind and his feelings toward defendant and his “clique.” It did not reference any crime or bad act that defendant was alleged to have committed or to have attempted to commit. Further, this testimony was necessary to explain why Darnell originally identified defendant as the shooter and then changed his story until days after the murder. It was not improper to present this explanation for the jury to weigh in judging the credibility of Darnell, who claimed he was an eyewitness to the murder.
Defendant also complains of Darnell’s testimony that he was carrying his gun for protection because he felt he needed it after testifying at defendant’s first trial. Again, Darnell spoke of his feeling and state of mind and not any specific | ^action committed or attempted by defendant. Accordingly, because this testimony does not constitute a reference to other crimes and does not fall within the scope of LSA-C.Cr.P. art. 770, the trial judge did not err in denying defendant’s motion for mistrial. We further note that defendant did not request that the jury be admonished regarding the comment.
Darnell also testified that he received a phone call from one of the club owners, “Verrett.” As a result of this call, Darnell was afraid of defendant and met with detectives in the case. Defense counsel anticipated this testimony and objected on the grounds of hearsay and other bad acts. After explanation from the State and trial judge, defense counsel agreed that the testimony regarding the telephone call would not be hearsay. As such, defendant cannot now complain. Nevertheless, we note that Darnell did not testify as to the contents of the conversation, but instead explained how he reacted as a result of the conversation, which was necessary to explain why Darnell was again changing his story. Further, even though a confrontation argument was raised in a motion for mistrial, it was not raised during the testimony. Instead, it was raised just prior to closing arguments.[4]
Based on the foregoing, the trial court did not err in overruling defendant’s objections and denying his motions for mistrial in regard to Darnell’s testimony.
Defendant complains of Kenneth’s testimony that he did not contact the police to tell them what he observed regarding the shooting because he was scared for his life. Kenneth explained that he heard what defendant’s “people” could do and what had happened to people in jail. However, defendant did not object to this testimony. Kenneth later testified that he hid from the prosecutors because he was scared for his life. Again, defendant did not object. On cross-examination, 11fidefense counsel told Kenneth that he understood he was afraid, and said “you watch movies and hear things on the street and television and all that, but Corey Miller never threatened you, did he?” Kenneth responded, “[n]o.” After further questioning, Kenneth denied that anyone associated with defendant or his family had ever threatened him. Kenneth agreed with defense counsel that there was a general sense that getting involved could get him hurt. On redirect, Kenneth said he was still afraid, but the truth had to be told. No objection was made.
Defendant’s arguments regarding Kenneth’s testimony have not been preserved *190 for appeal because he failed to contemporaneously object pursuant to LSA-C.Cr.P. art. 841. Nevertheless, like the testimony of Darnell, Kenneth’s testimony includes no specific actions or threats but a state of mind and belief that Kenneth possessed. Defense counsel made clear on cross-examination that no threats had been made by defendant, his family, or his associates to Kenneth. This testimony does not fit the definition of other crimes evidence. In addition, testimony regarding threats or actions made by people other than defendant is not considered to be “other crimes evidence.” See also Davis, 08-165 at 15-16, 993 So.2d at 304.
Accordingly, defendant’s arguments pertaining to inadmissible other crimes evidence during Kenneth’s testimony are without merit.
Next, we address defendant’s complaints regarding Detective Clogher’s testimony. Detective Clogher testified that Denise Williams originally identified the shooter as Derrick Taylor. Detective Clogher explained that he believed Denise was being untruthful and then at some point she admitted she lied about her identification of the shooter. Defense counsel made a hearsay objection, which was overruled. The State then asked if they arrested Denise. After the detective said she had not been arrested, the State asked why. Detective Clogher explained |17that Denise’s efforts of being untruthful were not to intentionally mislead the investigation, but were more out of safety concerns. Defendant objected because he was talking about her state of mind and on relevancy grounds. The State responded that the testimony revealed the detective’s state of mind as to why she was not arrested. The judge overruled the objection, but said for the State to make sure he explained why he did what he did as part of the investigation. Detective Clogher again explained that Denise did what she did because she was concerned for her safety. Defense counsel objected as to hearsay after Detective Clogher said Denise gave them a different name for the shooter. This objection was overruled.
Detective Clogher also testified that when he interviewed defendant, defendant asked him questions regarding the investigation and the levels of witness cooperation. No objection was made by defense counsel at this point. Later Detective Clo-gher was asked why he continued to investigate a crime after he already had a suspect in jail. He indicated that he wanted more witnesses so that witnesses would feel more comfortable, noting the fear in most of the witnesses. At this point, a bench conference was held and defense counsel moved for a mistrial on the basis of unsolicited gratuitous testimony about witnesses being afraid. Defense counsel then requested that the court admonish the jury regarding the comments of the witnesses being scared and fearing for their safety. The judge denied the request. Thereafter, defense counsel indicated there was no objection.
On cross-examination, defense counsel asked Detective Clogher about defendant questioning him about the investigation. Detective Clogher testified that he believed defendant’s questioning was consistent with “the threats that we had to the witnesses, that, you know, it seemed as an inquiry into the witnesses we had and to what level they were cooperating.” Detective Clogher added that, especially with Denise, he believed defendant was trying to “fish” to see if she was a witness | isand if she was cooperating. Defense counsel asked the detective if he believed defendant knew who Denise was, and Detective Clogher said no, but believed defendant’s associate had threatened her and “he would have knowledge ... of that threat.” *191 Defense counsel objected and argued that he had not elicited this testimony. A bench conference was held. The judge told defense counsel that he asked the question, but defense counsel answered that he did not ask anything about what an associate did. Defense counsel argued that it was a gratuitous, unsolicited statement. Defense counsel moved for a mistrial, and the judge denied the motion. Detective Clogher later said he believed defendant was fishing for names of witnesses to see if those who were threatened were cooperating.
Detective Clogher’s comment that he was gathering more witnesses so the witnesses who were scared would feel more comfortable does not point to an unambiguous crime or bad act by defendant. The detective was responding to a question as to why the investigation continued if a suspect had already been arrested and was in jail. Defense counsel moved for a mistrial on the basis of unsolicited gratuitous testimony about witnesses being afraid. Because defense counsel admitted that this testimony was unsolicited, he cannot now argue that the State elicited this testimony and it should be imputed to them under the mandatory mistrial of LSA-C.Cr.P. art. 770. The unsolicited and unresponsive testimony from a police officer is not chargeable against the State to provide a ground for mandatory reversal of a conviction. State v. Hayes, 10-685 (La.App. 5 Cir. 5/24/11), 70 So.3d 27.
Although defense counsel then requested that the court admonish the jury regarding the comments of the witnesses being scared and fearing for their safety, defense counsel indicated that there was no objection after the judge denied the request. Thus, defendant cannot now complain. Furthermore, to trigger the need |19for an admonition the remark must unambiguously refer to a crime alleged to have been committed by the defendant. Hayes, supra at *11.
Defendant also challenges the testimony of Detective Clogher when he suggests that defendant was fishing for information about the investigation to find out the level of cooperation of the witnesses and to see if witnesses had been threatened out of cooperating. Again, Detective Clogher did not provide any testimony as to unambiguous crimes or bad acts of defendant. Further, on cross-examination, defense counsel further questioned the detective as to the questions posed to the detective by defendant regarding the investigation.
Defendant also challenges the testimony regarding how Denise initially lied about the identity of the shooter and how one of defendant’s associates had threatened her. He argues that this was hearsay and he was denied his right to confrontation. Defense counsel did mention when objecting that Denise was not available for cross-examination. Further, defendant filed a motion for mistrial that was argued and denied just prior to closing arguments. A confrontation argument was mentioned in this argument.
Nevertheless, this testimony was properly admitted. Much of the testimony complained of regarding Detective Clo-gher, including his comments regarding Denise, involved an explanation of the course of the police investigation and steps leading to defendant’s arrest. The detective had to explain how Denise initially identified someone else as the shooter and why she was not arrested when she admitted she was being untruthful. Further, he had to explain how defendant was ultimately arrested when initially another name was given for the shooter by a witness. A police officer, in explaining his own actions, may refer to statements made *192 to him by other persons involved in the case. State v. Taylor, 07-93, p. 23 (La.App. 5 Cir. 11/27/07), 973 So.2d 83, 98, writ denied, 07-2454 (La.5/9/08), 980 So.2d 688. Such statements are admitted not to prove the truth of the matter asserted, but to explain the sequence of events leading to the arrest of the defendant from the officer’s viewpoint. Id.
Also, the testimony that an associate of defendant threatened Denise does not constitute other crimes evidence of defendant. Article 404(B)(1) only prohibits evidence of other crimes or bad acts committed by a defendant. See Davis, 08-165 at 15-16, 993 So.2d at 304.
As such, the trial court did not abuse its discretion in denying defendant’s motion for mistrial regarding Detective Clogher’s testimony. Further, the objections were properly overruled.
In summary, we find that the trial judge did not err in overruling objections and denying motions for mistrial regarding the testimonies of Darnell, Kenneth, or Detective Clogher. Nevertheless, even if any of this testimony did constitute impermissible references to other crimes by defendant, in light of the evidence produced at trial, any such error was harmless.
Finally, defendant complains of various comments made by the State during its closing argument. Specifically, defendant complains of the State’s comments that no matter what defendant did, or how scared people were, defendant could not get away from the truth, the question as to how many lives did defendant affect, and that defendant thought he was in charge of the investigation. He further complains that the State told the jury that Darnell received a call that the people were “riding” for him and looking for him. Defendant complains of the argument that reminded the jury of Detective Clogher’s testimony that witnesses did not appear at trial because of defendant’s intimidation tactics and that Denise was threatened into giving false information.
| aiThe scope of argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the State or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The State’s rebuttal shall be confined to answering the defendant’s argument. LSA-C.Cr.P. art. 774. However, a prosecutor retains “considerable latitude” when making closing arguments. State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, 374, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996). Further, the trial judge has broad discretion in controlling the scope of closing arguments. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, 1036, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
Our review of the record reveals that some of the closing argument complained of consists of the prosecutor simply repeating evidence that was found admissible, but complained of by defendant. Further, defendant has not pointed to any comments in closing argument regarding unambiguous crimes or bad acts committed by defendant that would constitute other crimes evidence. Nevertheless, even if the State’s argument was improper, a conviction or sentence will not be reversed for improper closing argument unless the court is thoroughly convinced the remarks influenced the jury and contributed to the verdict. See Taylor, supra at 375. The Louisiana Supreme Court has recognized that “much credit should be accorded to the good sense and fairmindedness of jurors who have seen the evidence and heard the argument, and have been instructed repeatedly by the trial judge that arguments of counsel are not evidence.” State *193 v. Mitchell, 94-2078 (La.5/21/96), 674 So.2d 250, 258, cert. denied, 519 U.S. 1048, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996).
LSA-C.Cr.P. arts. 770 and 771 govern improper comments made during closing arguments and authorize the trial court to correct a prosecutor’s prejudicial 122remarks by ordering a mistrial or admonishing the jury, at the defendant’s request. State v. Foster, 09-837, p. 14 (La.App. 5 Cir. 6/29/10), 44 So.3d 733, 742, writ denied, 10-1775, (La.4/25/11), 62 So.3d 84.
The comments made by the State during closing argument did not warrant a mistrial. There is no indication in the record that the prosecutor’s remarks so inflamed the jury that it influenced the verdict. The record shows the jury was specifically instructed that opening statements and closing argument were not to be considered as evidence.
Based on the foregoing, the trial court did not err by overruling defense counsel’s objections and by denying the motions for mistrial complained of. This assignment of error is without merit.
In his second assignment of error, defendant asserts that the prosecution systematically eliminated black people from the jury by using 8 of its 12 peremptory strikes against prospective black jurors. He contends that the impact of any improper exclusion of black citizens was particularly compelling because a non-unanimous jury, in which the two dissenting jurors were African American, convicted defendant. Specifically, defendant challenges the striking of Beyunka Cowart and contends that the prosecution claimed she was being struck because she said she could not sit in judgment of someone, when the record contradicts this. Defendant also explains that the State said it was striking her because she listened to rap music, but the State did not strike similarly situated white jurors who listened to rap music and, therefore, this was a pretext for discrimination. Defendant argues that the trial court simply affirmed that the prosecution had provided race neutral reasons for each of its strikes and failed to evaluate the | ^plausibility of the proffered reasons. Defendant concludes that the prosecution contravened Batson v. Kentucky[5] with its strike of Cowart.
The accused shall have a right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. The number of challenges shall be fixed by law. LSA-Const. art. 1, § 17. “In trials of offenses punishable by death or necessarily by imprisonment at hard labor, each defendant shall have twelve peremptory challenges, and the state twelve for each defendant.” LSA-C.Cr.P. art. 799.
The Equal Protection Clause of the United States Constitution prohibits purposeful discrimination on the basis of race in the exercise of peremptory challenges. See Batson v. Kentucky, supra. The Batson decision is codified in LSA-C.Cr.P. art. 795(C), which provides that no peremptory challenge made by the State or the defendant shall be based solely upon the race of the juror. Article 795(C) further provides that if an objection is made that the State or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory race neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror.
In Batson, the United States Supreme Court established a three-step anal *194 ysis to be applied when addressing a claim that peremptory challenges of prospective jurors were based on race. State v. Jacobs, 07-887, p. 18 (La.App. 5 Cir. 5/24/11), 67 So.3d 535, 554. Under Batson and its progeny, the defendant challenging the peremptory strike must first establish a prima facie case of purposeful discrimination. Second, if a prima facie showing is made, the burden shifts to the State to articulate a neutral explanation for the challenge. Third, the trial court 124then must determine if the defendant has carried the ultimate burden of proving purposeful discrimination. State v. Sparks, 88-0017 (La.5/11/11), 68 So.3d 435, 468.
At the second step of the Bat-son inquiry, the issue is the facial validity of the prosecutor’s explanation. Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (per curiam). Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race-neutral. Id. At the third step, implausible explanations offered by the prosecution “may (and probably will) be found to be pretexts for purposeful discrimination.” Jacobs, supra (quoting Purkett v. Elem, 514 U.S. at 768, 115 S.Ct. at 1771). The final step of Bat-son involves evaluating the persuasiveness of the justification proffered, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. Purkett v. Elem, 514 U.S. at 768, 115 S.Ct. at 1771.
In determining whether a defendant has met his burden of showing purposeful racial discrimination in the State’s exercise of peremptory challenges, the proper question is whether the proof offered by the defendant, when weighed against the State’s proffered race-neutral reasons, is strong enough to convince the trier of fact that the claimed discriminatory intent is present. State v. Bourgeois, 08-457, p. 10 (La.App. 5 Cir. 12/16/08), 1 So.3d 733, 738, writ denied, 09-0336 (La.11/6/09), 21 So.3d 298. Thus, the focus of the Batson inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes. State v. Tilley, 99-0569, p. 5 (La.7/6/00), 767 So.2d 6, 12, cert. denied, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001). The overall racial composition of the venire and the jury ultimately seated is a significant factor in determining whether a prima l^facie case has been established because it provides a “point of reference.” State v. Holand, 10-0325, p. 11 (La.App. 4 Cir. 4/18/11), 64 So.3d 330, 336.
A trial judge’s findings on a claim of purposeful discrimination are entitled to great deference by the reviewing court because they depend largely on credibility evaluations. Credibility can be measured by factors including the prosecutor’s demeanor, how reasonable or how improbable the explanations are, and whether the proffered reason has some basis in accepted trial strategy. State v. Wilson, 09-170, p. 13 (La.App. 5 Cir. 11/10/09), 28 So.3d 394, 405, writ denied, 09-2699 (La.6/4/10), 38 So.3d 299. Therefore, the court occupies the best position for deciding whether a discriminatory objective underlies the peremptory challenges. Id. “[A] trial court’s ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.” Snyder v. Louisiana, 552 U.S. 472, 477, 128 S.Ct. 1203, 1207, 170 L.Ed.2d 175 (2008) (citing Hernandez v. New York, 500 U.S. 352, 369, 111 S.Ct. 1859, 1871, 114 L.Ed.2d 395 (1991)).
In the present case, prior to when the first panel of prospective jurors was called, Ashleigh Colar indicated that she had babysitter issues and that serving would cause her financial hardship. The State moved to strike her for cause, but the trial *195 court refused. Thereafter, the first panel of potential jurors were called and questioned. Beyunka Cowart (Juror #42), a black female, the only juror complained of on appeal, was the first juror called from the first panel. The transcript reflects that when this panel was initially questioned, “Colar” was questioned. However, it also reflects that Colar was not called until the next panel. Eventually, the transcript reflects “Cowart” was questioned.
During questioning, Cowart revealed that she had heard about the case from the media. Cowart indicated she believed most people are better than society labels them and if a crime was seen on the subway most would step up and do the lafiright thing. Cowart rated the Jefferson Parish police at about an eight out of ten. She indicated she would be okay with defendant not testifying. Cowart was specifically asked if she had an issue with sitting in judgment of other people. She answered, “No, sir.” According to the transcript, “Colar” was familiar with defendant’s music, but did not have any of his CDs. When Cowart was asked if she listened to rap music, she responded “I listen to everything. I listen to rap music.” However, she indicated that her favorite songs were slow songs, R & B. After questioning the first panel of prospective jurors, the State used its first peremptory strike on Cowart, a black female. When the second panel of potential jurors were called and questioned, Colar was questioned within this panel of potential jurors. However, Colar was struck for cause when her baby showed up at the courtroom. After the first day of jury selection, the State used seven peremptory challenges (three blacks and four whites), defendant used six peremptory challenges (all whites), and eleven jurors had been selected (three blacks and eight whites).
Another panel of potential jurors was called on the following day and was questioned. After questioning of this panel, the State used three peremptory strikes on black jurors, Henry, Webb, and McKin-nies. At that time, defendant requested that the record reflect that the State had systematically wiped out blacks, and he made a Batson challenge. The court said that at that point they had a jury of 11, with three blacks on the jury. Defense counsel responded that the State struck three out of three. The court noted that defense counsel had struck all whites. Defense counsel said “it did not dispute all those challenges on three blacks.” The trial judge said that based on the current state of Batson, “just state race neutral reasons.”
|j>7The State explained that Henry said that he could not convict someone based on one witness and said, “that’s the law.” The trial judge said that he believed with Henry, Webb, and McKinnies, it was close calls on cause, but that defense counsel had rehabilitated them. After further discussion of these prospective jurors, the trial judge said he was denying the challenge as to Henry, Webb, and McKinnies.
When discussing the State’s peremptory strikes from the first day, at first, the State believed Cowart had been cut for cause. The trial judge and defense counsel said she was the State’s first peremptory. The State then suggested that Cowart said she could not sit in judgment of others, and that it had a “C” by Cowart. Defense counsel said that was wrong, because she had not been cut for cause. After the trial judge said the record showed it was a peremptory, the State indicated that it needed its “sheet” and believed it was at the office.
The State then said Cowart said she could not sit in judgment of others, and that her challenge for cause was denied. *196 The trial judge then indicated he had that Cowart was struck for cause, too. Defense counsel corrected the judge, and said that it was Colar, the woman whose baby came to the courtroom, who had been struck for cause. The judge agreed. The State again indicated it needed its notes from the day before.
The trial judge recognized that the day before the State had struck three of six blacks[6] and then that day had struck three blacks. The court requested that the State give race-neutral reasons. The State gave reasons for striking individual black prospective jurors. When the State indicated that Cowart was stricken because she said she could not judge others, the judge asked if that was in the State’s notes. The State responded that it was in Assistant District Attorney Wolfe’s notes, though Wolfe admitted the notes were “chicken scratch.” The trial Drudge said that was not in his notes, but this obviously was a race-neutral reason. Assistant District Attorney Swaim indicated that, if not mistaken, Cowart also said her kids listened to rap music and she listened to rap music, too. The State added that there was no pattern because she was the first potential juror. The State asked the court to take into account that three blacks were on the jury at that point and that the reasons given for the strikes that day were obviously issues in the case. The trial judge stated that he believed race-neutral reasons were provided by the State, and that he had an independent recollection of what the State had said, except he did not have in his notes that Cowart could not judge so he was not considering that. Thereafter, jury selection continued, and the final jury was composed of three black jurors and nine white jurors.[7]
After defendant made his Batson challenge, the State proffered race-neutral reasons, and the trial court determined that defendant failed to carry his burden of proving purposeful discrimination. Although the trial judge did not specifically state that there was no purposeful discrimination, throughout the proffering of the reasons the judge determined the explanations were race-neutral and he commented throughout the process, which suggests he was weighing the reasons with the evidence presented by defendant and finding credibility and truthfulness in the State’s proffered reasons.
As for Cowart, the State appeared confused about who she was and why she was excused. To further complicate things, the record appears to contain errors as to who responded to questioning, especially considering that one of the jurors that was listed as answering was not called until a later panel. At some point, even the judge appeared confused, but then realized who Cowart was. Further, although the Bat-son challenge was timely, the timing of the challenge did complicate the State’s 12nability to explain its race-neutral reasons for excusing Cowart, the first juror who had been called and excused on the day before the challenge.
In State v. Mamon, 26,337, pp. 16-17 (La.App. 2 Cir. 12/16/94), 648 So.2d 1347, 1358, writ denied, 95-0220 (La.6/2/95), 654 So.2d 1104, the Second Circuit Court of Appeal recognized that on appellate review it had to analyze whether the reasons given after a Batson challenge really were race-neutral and whether the trial court properly assessed the weight and credibility of each explanation. However, before *197 reviewing the State’s reasons, the court observed that the defendant’s timely Bat-son objection did not come until all challenges had been exercised. The judge stated the following:
Many of the prosecutor’s explanations were substantially accurate but contained errors. While we do not condone inaccuracy in the State’s explanations, we will make some allowance for it when the explanation is required not promptly after the contested questioning, but hours or days later, compelling the prosecutor to give explanations from memory or from sketchy notes.
Id. The court concluded that although some of the prosecutor’s explanations were incorrect, they were largely supported by the record on voir dire and other race-neutral explanations were apparent from the record. The Mamón court could not find that the trial court abused its discretion and found the trial court did not err in accepting the explanations. Id., 26,337 at 21, 648 So.2d at 1360.
In the present case, although some of the State’s explanations regarding Cowart appear to be inaccurate, the State still offered race-neutral reasons for excusing her that do not appear to be a pretext for purposeful discrimination. After realizing, with the help of the judge, that Cowart had not been struck for cause, the State explained that it believed she said she could not sit in judgment.[8] The record | ¡^clearly reflects that Cowart agreed that she could sit in judgment. However, the judge specifically discounted this explanation because he did not recall that it was true. Under the reasoning in Mamón, the State should have some allowance as to the accuracy in recalling what happened on the prior day of jury selection. Cowart was the first juror called and the first peremptory strike used.
The State also believed she listened to rap music, and that her kids listened to rap music as well. The record does support that Cowart said she listened to rap music. Although the transcript reflects that “Colar” said she was familiar with defendant’s music, arguably it was Cowart who said this, especially because Colar was not called until a later panel. The State questioned other prospective jurors about if they knew defendant and his music and whether they listened to rap music. Even defense counsel questioned the panel with concerns regarding rap music. The questioning regarding rap music was proper and significant under the unique circumstances of this case, which involved the trial of a known rap artist.
Based on a review of the entire voir dire transcript, we find that defendant failed to meet his burden of proving purposeful discrimination, and that the trial judge did not err in denying defendant’s Batson challenge. In view of the vast amount of discretion accorded to the findings of the trial court in assessing intent and judging credibility, the trial court did not err in choosing to believe the race-neutral explanations offered by the State. Accordingly, we find that this assignment of error is without merit.
In his third assignment of error, defendant asserts that the trial court erred by informing the jury that they would be permitted to listen to the 9-1-1 recordings during deliberations, but then reversing itself when the jury requested the recordings, based on the erroneous belief that *198 LSA-C.Cr.P. art. 793 did not allow jurors to examine 911 recordings during deliberations. Defendant further argues |31that the jury and defense relied upon the court’s promise that the recordings could be later listened to during deliberations. Defendant claims that one of the 9-1-1 calls from “Donald” was actually Darnell telling emergency personnel immediately after the shooting that he could not name or describe the shooter. Defendant suggests that the jurors may have wanted to listen to the tape again to resolve whether the voice on the tape was the same voice they heard on the witness stand.
During the cross-examination of Detective Donald Clogher, the 9-1-1 recordings were played for the jury and Detective Clogher was questioned about the calls. Several calls were made regarding the shooting. One of the callers appeared to be “Donald.” This person advised of the shooting and could not say who shot the victim. Detective Clogher testified that he did not believe any reference was made to defendant in the 9-1-1 recordings. On redirect, the State questioned Detective Clogher further. Detective Clogher testified that there were numerous operators on duty and there was no guarantee that all of the 9-1-1 calls regarding the incident were displayed on the incident history detail log of calls. Further, he said that there was no guarantee that every call made was on the tape. Detective Clogher testified that he did not hear Darnell’s voice on the tape, but that it was possible that Darnell’s call was assigned another item number.
Initially, the trial court provided that everything but writings could be sent to the jury for deliberations. He then said that the jury could not hear the tapes of testimony, but could hear the 9-1-1 tapes. Thereafter, in the first jury note, the jury requested the 9-1-1 tape, among other things. Defense counsel said he had no objection to any of the evidence requested and noted that the 9-1-1 tape required a tape recorder. He urged that the jury be allowed to play the tape in the jury room, but the judge wished to bring the evidence out and let them play the tape in the courtroom. The State then said it did not believe the jury could have the tape. | ^Defense counsel stated that he asked for all of the evidence to go in the jury room and was willing to waive any possible error for sending the evidence. It appears the judge believed that the tape was testimony, and the State agreed. Defense counsel argued the 9-1-1 tape was not testimony, but the State and the judge disagreed. Thereafter, the judge told the jury what the law allows to be brought into the jury room, explaining that they could take photographs with them, but could not see writings. The judge did indicate to them that if there was physical evidence other than writings they wanted to see, they should let him know. It does not appear that the jury requested to hear the 9-1-1 recordings again thereafter.
LSA-C.Cr.P. art. 798(A) provides:
Except as provided in Paragraph B of this Article, a juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence. Testimony shall not be repeated to the jury. Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict.
The principal evil or danger that LSA-C.Cr.P. art. 793 seeks to avoid is that the testimony or written evidence in question will be given undue weight. State v. Sellers, 01-1903, p. 13 (La.App. 4 Cir. *199 4/10/02), 818 So.2d 231, 239, writ denied, 02-1322 (La.1/9/04), 862 So.2d 974. However, a trial judge has sound discretion in permitting the jury's review of properly-admitted evidentiary exhibits during its deliberations, including audiotapes and videotapes. State v. Brooks, 01-0785, p. 4 (La.1/14/03), 838 So.2d 725, 728 (per curiam).
LSA-C.Cr.P. art. 793 generally prohibits “access to any written evidence” for its verbal content and prohibits the repeating of testimony to jurors during deliberations. Brooks, 01-0785 at 2, 838 So.2d at 727. Under the plain language | ssof article 793, a videotape or audiotape recording of a crime as it occurs is neither written evidence nor testimony. Brooks, 01-0785 at 3, 838 So.2d at 727-28.
Based on the applicable law, the 9-1-1 recordings would not be considered testimony, and would have been subject to the court’s discretion under LSA-C.Cr.P. art. 793. Even though the trial judge indicated that he believed the recordings were testimony and therefore, not allowed under Article 793, the record does not show that defendant was prejudiced. According to LSA-C.Cr.P. art. 921, “[a] judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused.”
In the present case, it appears that defendant’s primary reason for wanting the jury to be able to re-listen to the 9-1-1 tapes during deliberations was because he believed the call from “Donald” was actually from Darnell. Defendant argues that this caller said he did not know the identity of the shooter immediately after the shooting. Defendant speculates that the jury may have wanted to compare the voice on the tape to that of Darnell’s voice from when he testified in court to determine if Darnell’s voice was really the voice heard on the “Donald” call. However, the jury had a chance to listen to the tape during the cross-examination of Detective Clogher, who was questioned about the tape. Detective Clogher admitted that the callers did not indicate defendant was the shooter in the recordings. Detective Clogher explained that he did not hear Darnell’s voice on the recordings, but Darnell’s call could have been given another item number and there was no guarantee that all of the calls about this shooting would be on the report or the tape. A reluctance to tell a 9-1-1 operator the identity of the shooter would not be surprising in light of Darnell’s fear to come forward with the ^identification. Additionally, Darnell admitted when he testified that he had not identified the shooter when he called 9-1-1.
Based on the foregoing, we find no merit in this assignment of error. See also State v. Jones, 04-1258 (La.App. 5 Cir. 4/26/05), 902 So.2d 426.
In his fourth assignment of error, defendant claims that sustained deadlock and duress necessitated a mistrial. Defendant argues that the judge should have declared a mistrial when a juror indicated on her polling slip that she agreed with the guilty verdict but under duress to “get out of here.” Defendant contends this was one of four instances in which the jury indicated its inability to reach a verdict. Defendant also argues that the juror displayed misconduct by voting guilty based on factors outside of the record. Defendant contends that the judge should have advised the jury that it was alright to have a hung jury.
LSA-C.Cr.P. art. 775(2) provides that a mistrial may be ordered when the jury is unable to agree upon a verdict. Article 775 also provides for a mandatory mistrial when prejudicial conduct in or out *200 side the courtroom makes it impossible for the defendant to obtain a fair trial. Although a mistrial may be ordered when the jury is unable to agree upon a verdict, the length of time to be afforded a jury for deliberation is a matter within the discretion of the trial judge. State v. Ancar, 97-1974 (La.App. 4 Cir. 11/3/99), 746 So.2d 269, 273-74, writ denied, 00-0163 (La.6/30/00), 765 So.2d 1066. The complexity and severity of the case is an important factor in the determination of what is a reasonable time. Ancar, 97-1974, 746 So.2d at 274. There is no requirement that a judge declare a mistrial at the first sign of trouble. State v. Lowenfield, 495 So.2d 1245, 1259 (La.1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986).
LSA-C.Cr.P. art. 812(2) provides the following regarding written polling of the jury, in pertinent part: “[i]f an insufficient number required to find a verdict | .¡¡^answer ‘Yes,” the court may remand the jury for further deliberation, or the court may declare a mistrial in accordance with Article 775.”
In the present case, during deliberations, the jury informed the judge by its third note that they had a vote and could not move forward because no one would change their vote. The jury requested guidance from the court as to how to move forward. The trial judge explained to the parties how he wanted to proceed. Defense counsel stated he had no objection to the judge’s supplemental instructions, but objected to the judge telling the jury whether the time they had spent was a long time for deliberations. The judge informed the jury that they should consult with one another and consider each other’s views. The judge also explained that the jury should decide the case for themselves. He said, “[d]o not hesitate to reexamine your own views and to change your opinion if you are convinced wrong, but do not surrender your honest belief as to the weight and effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.” The judge said for them not to feel pressure to change their opinions, but to consider each other’s views. The jury’s next note informed the judge that they were making headway, but were exhausted. They felt they needed to rest and indicated they wanted to go to a hotel.
On the following morning, the jury began deliberations at 8:45 a.m. Thereafter, the jury indicated by its sixth note that a juror was sleeping in the jury room, reading a Bible, and quoting and writing scriptures. The jury asked what it should do because the juror wanted off the jury and did not seem to be able to handle the process. The judge informed the jury that they took an oath and had a duty to deliberate and consider each other’s views and then to make up each of their minds, announcing their positions if they could. The judge informed the jury that there could be no extraneous materials in the jury room and if there was a |S6Bible it needed to be removed. The judge reminded the jury they needed to decide the case based on the law and facts as given to them and as heard through the evidence, using their common sense and no extraneous factors.
When the judge spoke with the juror that was referred to in the jury’s sixth note, Bazile, he informed her that her vote mattered and she did not have to change her mind but she could change it if she believed she was wrong. Another juror, Vitrano, spoke to the judge about Bazile and voiced concerns that the process was not being able to be done as a group. The judge informed him that it was early in the morning. Defense counsel expressed that he had no objection to the way this was handled. The judge then told the jury *201 that hopefully they could make some headway, and he suggested that they take a break and then take another “stab at it.”
At 11:00 a.m., the jury returned a guilty verdict that was found to be invalid. When the jury was polled, it was learned that the ten of twelve verdict included juror Jacob’s handwritten note that her verdict was “yes,” but “under duress to get out of here.” Defense counsel noted there was a problem, and the trial judge agreed. The judge informed the jury that the verdict was “ten to two” which was a legal verdict, but in this case one juror said that the juror’s vote was under duress to “get out of here.” The judge informed the jury that this was invalid, and reminded the jury of the instruction that said that changing one’s mind for the sole purpose of reaching a verdict could not be done. The judge added that if the jury strongly felt that the vote would not change, they should let him know after they discussed it. He reminded the jury not to vote “yes” or “no” for the sole purpose of returning a verdict. The judge then sent the jury back for further deliberations. Defendant did not specifically object to the trial court’s further instruction or the manner in which he handled the jury’s invalid verdict.
|S7However, defendant moved for a mistrial because the jury had indicated by note the prior day its inability to reach a verdict, then one of the jurors expressed pressure and coercion, and then another juror indicated she voted for the verdict under duress to reach a verdict. Defendant moved for a mistrial because the jury manifested its inability to reach a verdict. This motion for mistrial was denied. The judge believed he had been clear that voting a certain way to get a vote was not valid and that they should let him know if they could not reach a verdict. Defendant noted his objection.
After further deliberations, a ten of twelve verdict was returned at 1:39 p.m., and the judge found this to be a legal verdict. In polling, juror Jacobs indicated that this was her verdict.
In State v. Nicholson, 315 So.2d 639 (La.1975), the Louisiana Supreme Court recognized the authority of a trial court to give further instructions to a jury unable to agree upon a verdict. However, the Court banned the use of the “Allen charge” or any “coercive modification” of an Allen charge. The Allen charge stems from the United States Supreme Court’s decision in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). State v. Foster, 09-837, p. 6 (La.App. 5 Cir. 6/29/10), 44 So.3d 733, 737, writ denied, 10-1775 (La.4/25/11), 62 So.3d 84. In Allen v. United States, supra, the United States Supreme Court approved a charge to break a jury deadlock and accomplish jury unanimity. The Allen charge was found to be problematic for two reasons. First, the charge emphasized that the jury had a duty to reach a verdict, implying that the judge would not accept a mistrial. Second, when the duty to reach a verdict is coupled with an admonition by the judge that those in the minority should rethink their positions, there exists almost overwhelmingly pressure to conform to the majority’s view. Foster, 09-837 at 7, 44 So.3d at 737. If a trial judge gives an Allen charge or any “coercive modification” of it, the trial court will have committed reversible error. Id.
In Foster, after approximately two hours of deliberation, the trial judge received a note from the jury with the following question: “What happens if we can’t come to an agreement; 8/4 vote.” The jury was returned to the courtroom and the judge informed the jury that it had not been deliberating long and the judge then reread part of the original jury charges. *202 Foster, 09-837 at 7-8, 44 So.3d at 737-38. The judge later received another note from the jury advising the court that it was deadlocked. At this túne, the judge proposed that the jury be brought back to the courtroom to determine whether they needed more time. Foster, 09-837 at 8, 44 So.3d at 738. The judge told the jury that they had been deliberating for roughly four and a half hours and that there had been juries that had deliberated a lot longer to reach a verdict. The judge reminded the jury of the instructions to consult with one another and consider each other’s views with the objective of reaching a just verdict, but that they had to decide the case for themselves. The judge also told them not to hesitate to reexamine their own views and to change their opinion if they were convinced they were wrong, but not to surrender their honest beliefs as to the weight and effect of the evidence solely because of the opinion of their fellow jurors. The judge also told them to let the court know if they were not going to change their minds, but if there was a possibility to “get ten to do anything” then they would take more time. After observing some jurors shake their heads yes, the judge decided to take more time for deliberations. Foster, 09-837 at 9-10, 44 So.3d at 739.
This Court found that the judge’s charges in Foster regarding further deliberations did not touch upon the elements that the United States Supreme Court found problematic in Allen. Foster, 09-837 at 10-11, 44 So.3d at 740. This Court |Mfurther recognized that the trial court indicated its willingness to accept a hung jury, which would result in a mistrial. This Court also recognized that the trial judge did not tell the jurors holding the minority view to rethink their positions in light of the majority’s stance in order to reach a verdict. Foster, 09-837 at 11-12, 44 So.3d at 740.
In the present case, the record does not show that a mistrial under LSA-C.Cr.P. art. 775(2) was warranted, because the jury could not agree on a verdict or because prejudicial conduct made it impossible for defendant to obtain a fair trial. On the first day of deliberations, when the jury informed the judge that they could not move forward, the trial judge gave them further instructions, and defense counsel did not object to these instructions. The jury later indicated that they were exhausted, so the trial judge allowed them to go to a hotel. On the second day, when the jury indicated that a juror was sleeping, reading a Bible, and quoting scripture, the trial judge ordered the Bible to be removed, spoke to two jurors, and once again gave the jury some instructions, which were not improper.
Although the initial verdict had the requisite number of votes for the verdict to be valid, one of the jurors wrote on the polling slip that she voted “yes” because she was under duress and apparently did not want to deliberate any longer. The judge explained to the jury that their first verdict was invalid and reminded the jury that changing their mind for the sole purpose of reaching a verdict could not be done. He further explained that if they strongly felt that they could not change their vote after a discussion, they should let him know. The judge did not give the jury a prohibited Allen charge. It was not improper for the judge to send the jury back to deliberate to discuss this and for the juror to decide if this was a legitimate “yes” or if she wanted to change her vote after being informed that it was not proper to vote “yes” simply to end deliberations. The trial court record does not | ^contain any evidence indicating that the final vote of juror Jacobs or any other juror was cast for any improper reason.
*203 Based on the record before us, as well as the applicable law, we find that the trial court did not abuse its discretion in denying defendant’s motion for a mistrial. Thus, we find no merit in this assignment of error.
In his fifth assignment of error, defendant contends that a juror’s consultation of a Bible during deliberations undercut the right to a verdict based solely on the evidence. He argues that the juror’s reading and citing scriptures from the Bible during deliberations warrants reversal.
On August 11, 2009, a jury note was sent to the trial judge indicating that a juror was sleeping in the jury room, reading the Bible, and quoting and writing scriptures. The note requested guidance, indicating that the juror wanted to be dismissed. At this point, defendant did not ask for a mistrial or specifically object, but he stated that it was inappropriate for the judge to instruct the jury beyond its instructions on how they should conduct their deliberations. The trial court again instructed the jury about deliberations. Thereafter, the judge told the jury that there could not be extraneous materials in the jury room. He asked if there was a Bible and ordered that it come out. He also indicated that the jury was bound to decide the case on the law and facts as given to them and heard through the evidence and by using their common sense, not extraneous factors.
Juror Bazile indicated that she wanted to speak to the court and to counsel. Ba-zile indicated she felt pressured and admitted she was reading the Bible. She said she took out the Bible when people started to yell and that she took it out after she made her decision and everyone was disagreeing -with her. The judge told her that her view and vote mattered and that she should consider others’ views, but did not have to change her mind.
_[4jThe record does not show that defendant specifically objected to the Bible and scriptures as extraneous evidence that undercut defendant’s right to a verdict based solely on the evidence presented. Defendant did request a mistrial, but only based on the jury’s inability to reach a verdict. Because defendant failed to move for a mistrial on the grounds that the Bible was an extraneous factor in the deliberation process that made it impossible for defendant to obtain a fair trial, this issue was not preserved for review on appeal. See LSA-C.Cr.P. art. 841.
Nevertheless, even if we address the issue before us, we find that it has no merit. Defendant cannot demonstrate that he was prejudiced by the juror’s reading or quoting from the Bible. Juror misconduct is not grounds for an automatic mistrial; prejudice must also be established. State v. Day, 414 So.2d 349, 350 (La.1982). In any trial, there is a presumption of jury impartiality. United States v. Winkle, 587 F.2d 705, 714 (5th Cir.1979), cert. denied, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). Prejudice may be shown by evidence that an extrinsic factual matter tainted the jury’s deliberations. Thus, an adequate demonstration of extrinsic influence upon the jury overcomes the presumption of jury impartiality and shifts the burden to the State to show that the influence demonstrated was not prejudicial. State v. Collins, 02-546 (La.App. 5 Cir. 11/26/02), 833 So.2d 476, 478, writ denied, 03-0059 (La.10/3/03), 855 So.2d 307.
In the present case, the judge learned of the Bible and scripture quoting prior to the verdict and was able to instruct the jury that it was bound to decide the case on the law and facts and by using their common sense. The judge informed the jury that they could not have extrañe *204 ous materials in the jury room and if there was a Bible it needed to be removed. As such, the jury received this supplemental instruction prior to when they rendered the verdict. Further, Bazile admitted she was reading the Bible, but said she took it out after she made her decision and 142everyone was disagreeing with her. As such, it appears that at least some jurors had made their decisions prior to when the Bible was presented. Also, Bazile did not vote that defendant was guilty of second degree murder, and she disagreed with the verdict. Finally, although the judge spoke to two jurors, defendant never argued that testimony from the jury was required to determine what effect or influence, if any, the Bible had on the jury during deliberations.[9]
Based on the record before us, along with the applicable law, we find no merit in this assignment of error.
In his sixth assignment of error, defendant asserts that the federal constitution requires unanimous verdicts in all criminal cases. Defendant recognizes that the United States Supreme Court in Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972) held that the Constitution does not compel unanimity for verdicts in state criminal cases, but he questions the vitality of Apodaca after the decision in McDonald v. City of Chicago, — U.S.-, 130 S.Ct. 3020, 3035, 177 L.Ed.2d 894 (2010). Defendant requests that this Court decide whether Apodaca is still good law.
LSA-C.Cr.P. art. 782(A) provides, in pertinent part, that “[cjases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.” This article is a counterpart to LSA-Const. art. 1, § 17(A).[10]
The United States Supreme Court has long held that non-unanimous juries do not violate a defendant’s Sixth Amendment right to trial by jury, made applicable to the states by the Fourteenth Amendment. State v. Thomas, 10-220, p. 11 (La.App. 5 Cir. 11/9/10), 54 So.3d 678, 685, writs denied, 10-2758 (La.4/25/11), 62 So.3d 89, and 10-2752 (La.5/20/11), 63 So.3d 974. In State v. Belgard, 410 So.2d 720, 726 (La.1982), the Louisiana Supreme Court followed the United States Supreme Court’s jurisprudence, explaining that “[t]his court has consistently held C.Cr.P. art. 782 does not violate the Sixth or Fourteenth Amendments to the United States Constitution.” Thomas, 10-220 at 12, 54 So.3d at 685.
In State v. Bertrand, 08-2215, p. 8 (La.3/17/09), 6 So.3d 738, 743, the Louisiana Supreme Court reversed the district court, which held Article 782 was unconstitutional and explained the following:
Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s still valid determination that non-unanimous 12-person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ral- *205 ing, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
As an intermediate appellate court, this Court is obliged to follow the precedent established by the Louisiana Supreme Court. Thomas, at 12-13, 54 So.3d at 686.
Defendant suggests that Apodaca is no longer good law in light of more recent jurisprudence from the United States Supreme Court, specifically, McDonald v. City of Chicago, Ill., — U.S. -, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). However, the substance of the McDonald opinion is clearly distinguishable, and it does not change our view of the current state of the law regarding non-unanimous jury verdicts.
Based on the foregoing, we find no merit in defendant’s argument that the federal constitution requires unanimous verdicts in all criminal eases.
144The State filed a “Motion to Strike Footnote 22 from Appellant’s Brief,” arguing that it was improper for defendant to refer to and include quotes from a newspaper article in a footnote submitted in support of the substantive argument in its brief, because the article was not included in the record.
Footnote 22 in defendant’s brief includes a quote from juror Jacobs from an interview with The Times Picayune that was supposedly published after the verdict. This article or quote, which discussed deliberations, is not included in the record.
In State v. Nichols, 03-1317 (La.App. 5 Cir. 3/30/04), 871 So.2d 590, 593-94, this Court recognized the following:
Although the Defendant has supported his allegations about the trial judge’s conduct with newspaper reports, both the Louisiana Supreme Court and this Court have recognized that courts of appeal have no authority to receive or review evidence not contained in the district court record. State v. Oubichon, 422 So.2d 1140, 1141 (La.1982); State v. Bibb, 626 So.2d 918, 924 (La.App. 5th Cir.1993), writ denied, 93-3127 (La.9/16/94), 642 So.2d 188.
In the present case, because the newspaper article referred to in footnote 22 was not made part of the district court record, it cannot be considered by this Court. Accordingly, the State’s “Motion to Strike Footnote 22 from Appellant’s Brief’ is granted, and we order footnote 22 to be stricken from the record.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). No errors requiring corrective action were noted.

DECREE

For the foregoing reasons, we affirm defendant’s conviction and sentence. We also grant the State’s “Motion to Strike Footnote 22 from Appellant’s Brief.”
| AñAFFIRMED; MOTION TO STRIKE FOOTNOTE 22 FROM APPELLANT’S BRIEF GRANTED

. This appeal is from defendant’s second trial. After his first trial, defendant was convicted of second degree murder. However, he filed a motion for new trial, which was granted by the district trial court. The State sought review from this Court and, on March 10, 2005, this Court granted writs and set aside the trial court's ruling. Thereafter, the Louisiana Supreme Court granted writs, reversed this Court’s ruling, and reinstated the district trial court's grant of defendant’s new trial. See State v. Miller, 05-1111 (La.3/10/06), 923 So.2d 625 (per curiam).

. A polling of the jury revealed that the decision was not unanimous, but instead was the decision of 10 of the 12 jurors.

. In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court discussed the Confrontation Clause and held that testimonial hearsay statements may be admitted as evidence at a criminal trial only when the de-clarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant.

. An irregularity or error cannot be complained of after the verdict unless it was objected to at the time of the occurrence. See State v. Taylor, 04-346, p. 9 (La.App. 5 Cir. 10/26/04), 887 So.2d 589, 595.

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

. According to the record, it appears that actually three of seven strikes were black prospective jurors.

. We note that the August 4th minute entry contains various errors regarding jury selection as to jurors and peremptory strikes.

. We note that the State did excuse other people they felt suggested that they could not sit in judgment. A juror’s inability to sit in judgment of another is a proper race-neutral reason for excusing a juror. See State v. Wilson, 09-170, p. 14-15 (La.App. 5 Cir. 11/10/09), 28 So.3d 394, 405-06, writ denied, 09-2699 (La.6/4/10), 38 So.3d 299.

. See LSA-C.E. art. 606(B), which provides that a juror may testify regarding whether any outside influence was brought to bear on any juror.

. LSA-Const. art. I, § 17(A) provides: "A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.”