PATRICIA RIVET MURRAY, Judge.
Bin this criminal case, the defendant, Marquez Holand, seeks review of his conviction for possession of heroin and the related sentence. The sole issue presented is whether the district court erred in finding that Mr. Holand failed to establish a prima facie case of racial or gender discrimination by the State in exercising its peremptory challenges to exclude ten African-American prospective jurors— nine of whom were women — in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); or both. See also La.C.Cr. P. art. 895.[1] For the reasons that follow, we find Mr. Holand established a prima facie case and thus remand to the district court with instructions.

STATEMENT OF THE CASE

On August 15, 2007, the State filed a bill of information charging Mr. Holand with possession with intent to distribute heroin, a violation of La. R.S. 40:966(A)(1). On September 21, 2007, he was arraigned and pled not guilty. On January 23, 2008, the district court found probable cause and denied Mr. Holand’s motion to suppress. On April 2, 2009, Mr. Holand’s first trial commenced and a mistrial was declared. On April 28, 2009, Mr. Holand’s second motion to suppress was denied.
*332 On August 3, 2009, Mr. Holand’s second trial commenced, and a twelve-person jury was selected. The jury was selected from two panels. After the first panel was selected, the State urged a reverse-Batson challenge to Mr. Holand’s use of his peremptory challenges to strike Caucasian jurors. Although the district court did not expressly rule on whether the State had established a prima facie case, defense counsel proffered race-neutral reasons for his strikes. The second panel was then seated, and the voir dire process continued. After the parties submitted their challenges, the State again urged a reverse-Batson challenge, and defense counsel proffered race-neutral reasons for his strikes. Defense counsel then urged a Batson (or J.E.B.) challenge to the State’s use of its peremptory challenges to strike African-American (and women) jurors. The district court found that defense counsel failed to establish a prima facie case of discrimination and denied the objection. The State was therefore not required to proffer race (or gender) neutral reasons for its strikes.
On August 4, 2009, the presentation of evidence commenced. The State called four witnesses: Sergeant Kevin Imbragug-lio; Detective Timothy Bender; Special Agent James Hurley, Jr.; and Special Agent Jason Quick. After the State rested, the defense called three witnesses: Re-teika Holand, Mr. Holand’s sister; Brandon Barnes, Mr. Holand’s neighbor; and Mr. Holand. The jury found Mr. |sHoland guilty of the responsive verdict (lesser included offense) of possession of heroin.
On August 27, 2009, the district court denied Mr. Holand’s motion for new trial, and sentenced him to serve seven and one-half years at hard labor. On September 2, 2009, the district court denied Mr. Ho-land’s motion to reconsider sentence. This appeal followed.

STATEMENT OF THE FACTS

On June 14, 2007, Sergeant Imbraguglio established surveillance of a residence on South St. Patrick Street. Mr. Holand, who was the target of a narcotics investigation, resided at the residence. That morning, Sergeant Imbraguglio observed Mr. Holand exit his residence, proceed to the corner of South St. Patrick Street and Baudin Street, and engage in an apparent hand-to-hand exchange. Based on his observations, Sergeant Imbraguglio obtained a search warrant for Mr. Holand’s residence. That afternoon, he executed the warrant with the assistance of several members of the New Orleans Police Department (“NOPD”) and the Federal Bureau of Investigation (“FBI”).
When the warrant was executed, the officers found Mr. Holand and his girlfriend in the bedroom of the residence and advised them of their rights. Mr. Holand showed the officers a cigar box that contained approximately a quarter ounce of raw, uncut heroin and numerous small foils containing heroin. A digital scale and $147 in cash were located in the bedroom. FBI Special Agent Hurley | recovered 127.8 grams of uncut heroin behind a fireplace in the living room. No weapons were found.
Detective Bender identified a four-page, handwritten statement that he took from Mr. Holand. According to Detective Bender, Mr. Holand voluntarily gave the statement on the date of his arrest at his kitchen table. Detective Bender explained that he handwrote the statement out himself because Mr. Holand was very upset. Detective Bender identified Mr. Holand’s initials at the bottom of each page and his signature on the last page of the dated statement. The majority of the questions Detective Bender asked Mr. Holand con *333 cerned Henry Cargo.[2] Mr. Cargo was the father of Mr. Holand’s nephew; Mr. Ho-land’s sister, Reteika Holand, and Mr. Cargo had a child together. Sergeant Im-braguglio identified Mr. Cargo as a major drug dealer in the Holly Grove (Pidgeon-town) area. In his statement, Mr. Holand stated that the heroin recovered behind the fireplace belonged to Mr. Cargo and that the other heroin recovered belonged to him. Mr. Holand denied selling any drugs.
At trial, Mr. Holand denied making, signing, or initialing the statement Detective Bender identified. He also denied selling drugs. He explained that he had a modest lifestyle and owned neither a car nor expensive possessions. He further explained that he earned a living breeding animals — American pit bull terriers, American Stafford Chanteres, and Bionic Reptiles. He admitted that he |shad prior convictions for possession of stolen property, possession of a concealed weapon, and possession of marijuana.
Mr. Barnes, Mr. Holand’s next door neighbor, testified that he was home when the police executed the search warrant. According to Mr. Barnes, the police required him to stay outside on his porch during the search. While outside he saw a police officer exit the back of the house carrying a box similar to the one introduced at trial and heard an officer say, “We got him now.”
Reteika Holand, Mr. Holand’s sister, testified that at the time of her brother’s arrest she was a student at Delgado University. On the day of the arrest, she went to her brother’s apartment after her 10:15 a.m. class ended; and she stayed there until 1:30 p.m. She denied seeing her brother selling drugs. Thereafter, she learned from Mr. Cargo — as noted, she and Mr. Cargo had a child together — that her brother had been arrested. In response to the question whether Mr. Cargo had access to her brother’s apartment, she replied: “Yes, I have a key.”

ERRORS PATENT

A review of the record for errors patent reveals none.

DISCUSSION

ASSIGNMENTS OF ERROR

Mr. Holand raises two assignments of error on appeal both of which related to the State’s alleged Batson (or J.E.B.) violation. He contends that he was denied his constitutional right to due process when the State was permitted to exclude African-Americans from serving on the jury. He further contends that the district court erred in finding that he did not make a prima facie showing of racial discrimination and in failing to require the State to provide race neutral reasons for its exclusion of African-American females from serving on the jury in his trial in violation of his Fourteenth Amendment right to due process and Batson, supra.
Equal protection prohibits the peremptory challenge of a prospective juror based on race. Batson, supra. Holding that the equal protection likewise prohibits the peremptory challenge of a prospective juror based on gender, the Supreme Court in J.E.B., supra, extended the principles enunciated in Batson to gender.[3]
*334 In Batson, the United States Supreme Court adopted a three step process for determining whether a prosecutor has exercised a peremptory challenge in a racially discriminatory fashion. The defendant first must demonstrate a prima facie case of purposeful discrimination (step one). Once the defendant establishes a prima facie case of discrimination, the burden shifts to the prosecutor to give race-neutral reasons for the peremptory challenges (step two). After the prosecutor has presented his reasons, the trial court must assess the weight and credibility of the explanation to determine whether the defendant has met the ultimate burden of proving purposeful discrimination (step three). Batson, 476 U.S. at 93-95, 106 S.Ct. 1712. The same three step process applies in addressing an alleged J.E.B. violation.
The instant appeal involves only step one: whether Mr. Holand made a prima facie case of a Batson (or J.E.B.) violation. Step one “places a burden of production or of ‘going forward’ on the defendant.” State v. Green, 94-0887, p. 24 (La.5/22/95), 655 So.2d 272, 287. Stated otherwise, the burden of proof is on the defendant to show that the prosecutor exercised peremptory challenges to remove members of a particular race (or gender) from the jury venire. If the defendant fails to make out a prima facie case, the Batson challenge fails; and the State is not required to provide race-neutral reasons for the exercise of its peremptory challenges. Green, 94-0887 at p. 24, 655 So.2d at 287-88.
The three factors required to establish a prima facie case of discrimination are: (1) the prosecutor’s challenge was directed at a member of a cognizable group; (2) the prosecutor’s challenge was peremptory (as opposed to for cause)(“peremptory challenges constitute a jury selection practice that permits ‘those to discriminate who are of a mind to discriminate’ ”); and (3) the circumstances are sufficient to allow an inference to be made that the prosecutor struck the veni-re member based on his or her race. State v. Myers, 99-1803, p. 4 (La.4/11/00), 761 So.2d 498, 501 (quoting Batson, 476 U.S. at 96, 106 S.Ct. 1712).
The sole focus of the Batson inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes. Green, 94-0887 at p. 24, 655 So.2d at 287. The defendant may offer any facts relevant to the question of the prosecutor’s discriminatory intent to satisfy his initial burden of proving a prima | ¡facie case of discrimination. As the Louisiana Supreme Court outlined in Green, supra:
Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination.
Green, 94-0887 at p. 24, 655 So.2d at 288. Although in Batson the Supreme Court did not define in detail what constitutes a pri-ma facie case, it noted that it had “confidence that trial judges, experienced in supervising voir dire, will be able to decide if *335 the circumstances concerning the prosecutor’s use of peremptory challenges creates a prima facie case of discrimination against black jurors.” Batson, 476 U.S. at 97, 106 S.Ct. 1712.
With these principles in mind we address the issue presented in this appeal of whether Mr. Holand presented a prima facie case of racial (or gender) discrimination so as to require the prosecutor to respond with race (or gender) neutral reasons for the strikes.
During the voir dire proceedings, the State used a total of eleven peremptory challenges. After the first panel was examined, the State used a total of five peremptory challenges to strike three African-American women, one African-American man, and one Caucasian man. After the second panel was examined, the State used a total of six peremptory challenges to strike six African-American women. After each side exercised their peremptory challenges, the State re-urged 19its revers e-Batson challenge. At the district court’s suggestion, defense counsel offered race-neutral explanations for its challenges. Defense counsel then asserted a Batson (or J.E.B.) challenge against the State’s use of its peremptory challenges. In response, the district court verified the race (and gender) of the eleven prospective jurors the State had struck. The following colloquy between the Court and defense counsel (Mr. Fuller) ensued:
By the Court:
Well after checking the cuts by the State, with the exception of [Juror # 1], who is a white male — with that exception — it’s not everybody. [Juror # 1] is a white male, so it’s not everybody. That’s the Court’s ruling.
By Mr. Fuller:
What is?
By the Court:
It’s not everybody, Counselor?
By Mr. Fuller:
Note my objection.
By the Court:
The jury is composed of numerous people of numerous races and numerous genders.
By Mr. Fuller:
But the State has elected to excuse one black male and ten [ (sic) ] black women[4] and one white male.
By the Court:
|,nOnce again, the Court finds that the Defense has not established a prima fa-cie case.
By Mr. Fuller:
They don’t have to use all of their strikes on the same race, but if they use an unjustifiable number on one race and one sex, which they have — they have used eleven strikes and out of those eleven, nine are black women.
[[Image here]]
By the Court:
The Court finds that Defense has not established a prima facie case in contravention of Batson. There are cross gender jurors, albeit minimal, there are cross gender jurors.
[[Image here]]
By Mr. Fuller:
Your Honor, at least in the second panel, you should question them about the ones in the second panel because the second panel was one hundred percent black women. The panel consisted of half and half, including males and females and the State elected to use all of their strikes on black women. And, *336 Your Honor, they haven’t been asked for reasons.
[[Image here]]
By the Court:
We’re going to close this out. We have to get back outside. My ruling stands.
The record contains a complete transcript of the voir dire proceedings, but it is devoid of any indication of the race (or the gender) of either the venire or the jury that was ultimately impaneled. The lack of this numerical data from the record renders it difficult to determine whether the district court correctly found that Mr. Holand failed to establish a prima facie case of discriminatory intent. The overall racial (or gender) composition of the venire and the jury ultimately seated |nis a significant factor often considered in determining whether a prima facie case has been established because it provides a “point of reference.” Kenneth J. Melilli, Batson in Practice: What We Have Learned About Batson and Peremptory Challenges, 71 Notre Dame L.Rev. 447, 476 (1996) (noting that “the raw number of peremptory challenges used against targeted-group members is meaningless without some point of reference.”)
Our review of the trial court’s decision is hampered not only by the lack of numerical data regarding the composition of the venire and jury, but also by the district court’s failure in its rulings and observations to provide guidance. The colloquy between the district court and defense counsel, quoted above, suggests that the district court may have denied Mr. Holand’s Batson (or J.E.B.) challenge because the State utilized one of its eleven challenges to strike a Caucasian male prospective juror. Standing alone, this fact is insufficient to establish that Mr. Holand failed to make a prima facie case of discriminatory intent. Furthermore, the district court’s general observations that the jury was composed of “numerous people of numerous races and numerous genders” and that there were “cross gender jurors” offers little guidance. For guidance, we turn to the recent jurisprudence on this issue.
The Louisiana Supreme Court in State v. Myers, 99-1803 (La.4/11/00), 761 So.2d 498, addressed a situation in which the trial court declined to address a defendant’s Batson challenge. The defendant argued that his equal protection rights were violated after the State used its peremptory strikes to exclude six African-_jAmerican12 potential jurors from the veni-re in a discriminatory manner, but the trial court failed to rule on the Batson challenge. The record reflected that the first panel of jurors called included three African-American jurors. One African-American juror was selected, and the State used two peremptory challenges to exclude the remaining two. The second panel of jurors contained two African-American veni-re members, both of whom were excused by the prosecution with peremptory challenges. During the selection process, defense counsel put the trial court on notice that he questioned the peremptory strikes being made by the State; however, the trial court treated the defendant’s objections dismissively and never issued a ruling on the issue of whether the defendant had established a prima facie case.
The Supreme Court in Myers held that the trial court’s failure to rule on the Bat-son issue raised serious equal protection issues and that the specter of racial discrimination could not be discounted because of the trial court’s failure to rule. Furthermore, because the trial judge had recently died, the option to remand for a hearing on the defendant’s showing of a prima facie case was not available; the Supreme Court explained that “without *337 the presence and participation of the trial judge, a meaningful hearing on the issue [was] all but impossible.” Myers, 99-1803 at pp. 6-7, 761 So.2d at 502-03. Accordingly, the Supreme Court reversed the defendant’s conviction and remanded for a new trial.
A similar issue was addressed by the Louisiana Supreme Court in State v. Givens, 99-3518 (La.1/17/01), 776 So.2d 443. In that case, the defendant claimed that the State impermissibly struck potential male jurors because of their gender in 11 (violation of J.E.B. The jury impaneled in Givens consisted of one man and eleven women. The record reflected that the defense struck a total of nine women and two men, and the prosecutor struck a total of seven women and six men. During the voir dire, the defendant objected to the State’s use of peremptory strikes against men on four separate occasions. On each occasion, the trial court denied the objection and declined to require the prosecutor to provide reasons for any challenges it exercised against potential male jurors. Because the trial court did not articulate its reasons for denying the defendant’s J.E.B. challenges, the Supreme Court noted that it was unable to review the trial court’s reasoning. The Supreme Court further noted that a similar situation was presented in the Myers case, discussed above, in which the trial court failed to rule on the Batson issue.
Despite the lack of any guidance from the trial court, the Supreme Court in Givens concluded that the defendant presented enough evidence to establish a prima facie case of purposeful gender discrimination. The Supreme Court reasoned as follows:
Similar to Myers, there is no obvious reason for the prosecutor’s strikes in this case other than gender. The defendant has presented enough evidence to establish a prima facie case of purposeful discrimination based on the fact that the prosecutor struck six male jurors for no apparent reason, three of whom were backstruck after being accepted by the defense, with the resulting jury composed of eleven women and one man. These facts evidence a pattern of strikes against male jurors and a disparate impact on the final composition of the jury. Therefore, the trial court should have required the prosecutor to offer gender-neutral explanations for the strikes.
Givens, 99-3518 at p. 8, 776 So.2d at 451. The Supreme Court thus remanded for an evidentiary hearing at which the trial court was instructed to allow the 114prosecutor to provide gender-neutral reasons for the strikes (step two) and to make a final determination of whether the defendant met his burden of proving purposeful discrimination (step three).
Another case in which the Louisiana Supreme Court reversed a trial court’s finding that the defendant failed to establish a prima facie case of discriminatory purpose (step one) is State v. Drake, 08-1194 (La.1/30/09), 2 So.3d 416. In Drake, the Louisiana Supreme Court noted:
The trial court found that defendant had failed to satisfy the first step in the three-part test of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) because he did not make a prima facie showing of discriminatory purpose. However, the Supreme Court “did not intend the first step to be so onerous that a defendant would have to persuade the judge-on the basis of all the facts, some of which are impossible for the defendant to know with certainty-that the challenge was more likely than not the product of purposeful discrimination.” Johnson v. California, 545 U.S. 162, 170, 125 S.Ct. 2410, 2417, 162 L.Ed.2d 129 (2005). A defendant *338 “satisfies the requirements of Batson’s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.” Id.
Drake, 08-1194 at pp. 1-2, 2 So.3d at 417. In Drake, the State utilized its first eight challenges against African-American jurors. The Court’s analysis was as follows:
In the present case, the state excluded peremptorily eight out of the 10 eligible African-American jurors called for examination after the court excused seven other African-American jurors for cause. As a result, and even accounting for the state’s selection of two African-American jurors for the panel, one of whom the defendant then struck, Caucasian jurors were significantly overrepresented on the panel in comparison to their number in the overall tally of jurors called for examination, and African-American jurors were grossly underrepresented.
These circumstances give rise to a reasonable inference of discriminatory purpose, although they might not support a finding that more probably than not race played a role in the state’s exercise of its peremptory challenges. Johnson expressly cautioned that “[t]he Batson framework is designed to produce actual answers to suspicions |15and inferences that discrimination may have infected the jury selection process.... The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question.” Johnson, 545 U.S. at 172, 125 S.Ct. at 2418.
Drake, 08-1194 at p. 2, 2 So.Sd at 417. The Louisiana Supreme Court thus remanded the matter to the district court to provide the State with an opportunity to offer race-neutral reasons for the exercise of its peremptory challenges (step two) and for a ruling by the trial court on the question of whether race played a role in the selection of defendant’s jury (step three).
Finally, in State v. Maxwell, 08-1007 (La.App. 4 Cir. 8/19/09), 17 So.3d 505,[5] this court reversed a defendant’s conviction after the State used nine of its twelve peremptory challenges to exclude African-Americans from the jury and exercised cause challenges only against African-American venire members. Ultimately, the jury impaneled consisted of ten Caucasians and two African-Americans, which this court noted was not reflective of the population of the Parish of Orleans in which the case was tried. Although the State offered race neutral reasons for the exercise of five of its peremptory challenges, the trial court did not require the State to offer reasons for the first four challenges that it exercised. Concluding that the defense established a prima facie case of discriminatory intent on the State’s part, this court reversed the defendant’s conviction and remanded for a new trial. However, the Louisiana Supreme Court reversed this court’s decision in part — to the extent that this court outright reversed 11fithe defendant’s conviction — and remanded for further proceedings as in Drake, supra. State v. Maxwell, 09-2235 (La.4/16/10), 33 So.3d 155.
Although on this record in this case we are unable to accurately assess what impact the State’s exercise of its peremptory challenges had on the composition of *339 the jury ultimately impaneled, we conclude that the State’s use of ten of its eleven peremptory challenges to strike African-Americans — nine of whom were women— was sufficient to establish a prima facie case of discrimination — racial, gender, or both. These numbers alone were sufficient to establish at least “the inference” that discrimination had occurred. Johnson v. California, 545 U.S. 162, 170, 125 5.Ct. 2410, 162 L.Ed.2d 129 (2005); see also Saunders v. Tennis, 720 F.Supp.2d 682, 691 (E.D.Pa.2010)(noting that “[a] pattern showing eight of nine peremptory strikes on African-American women is ‘certainly strong enough to suggest an intention of keeping [African-Americans] off the jury.’ ”)[6] We thus find, contrary to the trial court’s conclusion, that Mr. Holand established a prima facie case of discrimination.
Given our finding that Mr. Holand satisfied step one, we, as the Supreme Court did in the line of cases discussed above, remand to the district court to allow the State an opportunity to offer race (and gender) neutral reasons for its strikes (step two), and for the district court thereafter to issue a ruling on whether race (or gender or both) played a role in the selection of the jury (step three). In the event of an adverse ruling on the Batson (or J.E.B.) issue, Mr. Holand may file another appeal.

DECREE

For the foregoing reasons, this case is remanded to the district court for it to provide the State with the opportunity to articulate race-neutral reasons for the exercise of its ten peremptory challenges against African-American venire members, to articulate gender-neutral reasons for the exercise of its nine peremptory challenges against women venire members, and to thereafter rule on the ultimate issue under Batson and J.E.B. of whether the prosecutor intentionally used race or gender or both as a basis for the selection of jurors to try the defendant’s case.
REMANDED WITH INSTRUCTIONS

. Mr. Holand's challenge, as the district court recognized, is based on both race and gender, which are overlapping categories. See Saunders v. Tennis, 720 F.Supp.2d 682, 691, n. 10 (E.D.Pa.2010) (noting that "[a]lthough the Supreme Court has not identified African-American females as a protective group, Batson forbids intentional discrimination on the basis of race or gender” and “gender and race are overlapping protective categories.")

. At the time of the trial, Mr. Cargo was deceased.

. The holdings in Batson and J.E.B. are codified in La. C.Cr.P. art. 795(C), which provides: No peremptory challenge made by the state or the defendant shall be based solely upon the race or gender of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race or gender, and a prima facie case supporting that objection is made by the objecting party, *334 the court may demand a satisfactory race or gender neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror

. The record reflects that the State struck nine African-American women.

. As noted below, the Louisiana Supreme Court reversed in State v. Maxwell, 09-2235 (La.4/16/10), 33 So.3d 155.

. In Saunders, supra, a federal habeas corpus proceeding, the defendant was found to be entitled to an evidentiary hearing on whether the State used its peremptory challenges to strike African-American women from the jury in violation of Batson.