NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-834

STATE OF LOUISIANA

VERSUS

VASCHON S. BLOUNT

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 08-477
HONORABLE EDWARD LEONARD, JR., DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE

**********

Court composed of Sylvia R. Cooks, Elizabeth A. Pickett, and Phyllis M. Keaty, Judges.

AFFIRMED.

J. Phillip Haney
District Attorney
Angela B. Odinet
Assistant District Attorney
300 Iberia Street, Suite 200
New Iberia, LA 70560
(337) 369-4420
COUNSEL FOR APPELLEE:
      State of Louisiana

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT-APPELLANT:**
    **Vaschon S. Blount**

**PICKETT, Judge.**

<u>FACTS</u>

On the evening of December 29, 2007, the defendant, Vaschon Blount, attended a wedding reception in Iberia Parish. After he had been there for approximately two hours, the victim, Michael Zachary, entered the reception hall. The two men had a verbal confrontation which began to escalate, so other men at the reception separated them. The defendant's girlfriend, Vanity Archangel, was the victim's high school girlfriend. The victim was escorted out first, and other bystanders asked the defendant to leave too. Before the defendant left the building, several people heard gunshots.

Once the defendant was in the parking lot, he retrieved a pistol from his car. There was conflicting testimony regarding whether the victim was in or out of his car, whether the victim had a weapon in his hand, and whether the victim fired the weapon. Testifying at trial, the defendant admitted firing his pistol but claimed the victim was pointing a weapon at him. He state that he handed his pistol to Skylar Archangel, his girlfriend's uncle, and left the scene. One round struck the victim in his leg. The subsequent police investigation revealed two holes in the victim's car door and the victim's pistol on the back dashboard. A deputy recovered the defendant's weapon after being informed of its whereabouts by Graylin Chevalier, a friend of Vanity Archangel's mother.

On March 13, 2008, the state filed a bill of information charging the defendant with attempted second degree murder, a violation of La.R.S. 14:27 and 14:30.1. Jury selection began on July 26, 2010, but the trial court granted the defendant's motion for continuance. Selection resumed on October 25, 2010.

The jury began hearing evidence on October 26, 2010. The next day, it found the defendant guilty of aggravated battery, a lesser offense defined by

La.R.S. 14:34.  On February 15, 2011, the trial court sentenced the defendant to nine years at hard labor.  On April 12, 2011, the trial court heard the defendant's motion to reconsider sentence and denied it.

The defendant now appeals his conviction and sentence, assigning four errors.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record.  After reviewing the record, we find there are no errors patent.

## ASSIGNMENTS OF ERROR

The defendant asserts four assignments of error:

1.      The trial court erred in denying defense counsel's *Batson* challenge.

2.      The trial court erred in finding the defendant guilty of aggravated battery.

3.      The trial court erred in refusing to allow the jury to view the victim's vehicle.

4.      The trial court erred in imposing an excessive sentence.

## ASSIGNMENT OF ERROR NUMBER TWO

We will address the defendant's second assignment of error first because a finding that the trial evidence was insufficient would necessitate outright reversal of the conviction.  *State v. Hearold*, 603 So.2d 731 (La.1992).  This court has explained:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981).  It is the role of the fact

finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the Jackson standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

In the present case, the defendant did not deny shooting the victim. Rather, he introduced evidence indicating the shooting was justified as self-defense. Such claims are governed by La.R.S. 14:19, which states in pertinent part:

> A. The use of force or violence upon the person of another is justifiable when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession, provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this Section shall not apply where the force or violence results in a homicide.
>
> . . . .
>
> C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using force or violence as provided for in this Section and may stand his or her ground and meet force with force.
>
> D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used force or violence in defense of his person or property had a reasonable belief that force or violence was reasonable and apparently necessary to prevent a forcible offense or to prevent the unlawful entry.

This court explained in *State v. Charles*, 00-1611, p. 10 (La.App. 3 Cir. 5/9/01), 787 So.2d 516, 522-23, *writ denied*, 01-1554 (La. 4/19/02), 813 So.2d 420:

> [I]n non-homicide cases, such as this one, the burden is upon a defendant to show by a preponderance of the evidence that the use of force or violence was "committed for the purpose of preventing a forcible offense against the person . . . provided that the force or violence used must be reasonable and apparently necessary to prevent such offense." [*State v.*] *Anderson* [98-492 (La.App. 3 Cir.

3

10/28/98)], 721 So.2d [1006] at 1010, [*writ denied*, 98-2976 (La. 3/19/99), 739 So.2d 781] quoting La.R.S. 14:19; *State v. Joubert*, 97-1093 (La.App. 3 Cir. 2/4/98); 705 So.2d 1295; *State v. Hall*, 606 So.2d 972 (La.App. 3 Cir.1992), *writ denied*, 93-0051 (La.11/11/94); 644 So.2d 385; [*State v.*] *Perkins*, 527 So.2d 48 [(La.App. 3 Cir. 1988)].

> When a defendant in a homicide case claims self-defense, the state has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense, *State v. Garcia*, 483 So.2d 953 (La.1986). In non-homicide cases, such as this, the defendant must carry the burden of proving self-defense by a preponderance of the evidence. *State v. Barnes*, 491 So.2d 42 (La.App. 5 Cir.1986); *State v. Mason*, 499 So.2d 551 (La.App. 2 Cir.1986).

*Joubert*, 705 So.2d at 1298, quoting *State v. Hall*, 606 So.2d [972,] 973-74 [(La.App. 3 Cir.1992), *writ denied*, 93-51 (La. 11/11/94), 644 So.2d 385.]

In the present case, witnesses gave several different versions of the pertinent events. Leaving aside the varied accounts of what occurred in the reception hall before the shooting, the victim, his mother, Sandra Zachary, and his sister, Raven Zachary, all testified that once he was outside, the victim got into his car with his cousin, Craig Knatt.[1] Mrs. Zachary testified she walked out with the victim. Once he was in the car, she observed her son had a weapon in his lap. The victim acknowledged having a pistol but testified it was between his leg and the console. He also had a box of ammunition in the car. Raven did not see the victim with any weapon. Raven testified she went out to the car to check on her brother and mother. All three of these witnesses stated that as they talked, the defendant ran toward the car firing a weapon. When the shooting started, the victim began to drive away. The victim testified a bullet passed through his car door and struck

---

[1]Witnesses agreed that some sort of verbal confrontation occurred inside the reception hall. The defendant and the victim each alleged the other man displayed a weapon. The victim stated the defendant cursed and pointed a weapon at him.

him in the leg.[2] Craig gave testimony similar to the victim's. Both men testified that soon after they cleared the parking lot, Craig took the wheel because of the victim's injury and drove to a hospital.

There were some inconsistencies among the accounts given by the three family members, for example, the location of the victim's weapon -- or whether he even had one. However, perhaps the most significant possible shadow on their collective credibility is whether a bullet could have passed through the victim's car door and struck him in the leg without breaking his window. The victim testified that his car window was rolled down. The defendant suggests as much on appeal, and his trial counsel questioned the victim vigorously on this point.

Lieutenant Jeff Matthews of the Jeanerette City Marshal's Office was an Iberia Parish deputy at the time of the shooting and assisted in its investigation. During his testimony, the following colloquy occurred:

Q.     Now on the outside it shows the entry point, correct?

A.     Yes.

Q.     Okay. And looking at your report, your report reflects you observed where the bullets entered the car door, correct?

A.     Yes, sir.

Q.     But your report makes no mention of you[r] observing the exit of the bullet, correct?

A.     Correct.

Q.     So is it safe to say the bullet did not pass completely through the car door, based on your report.

A.     Based on the report.

Q.     Yeah. And your report was based on the information you learned on this night.

---

[2]There were two apparent bullet holes in the outer part of the car door, but the victim was struck only once.

A.   Yes.

Q.   So it would be impossible for the bullet to pass completely through the car door because you would have made note of that in your report.

A.   Unless I mistakenly forgot.

Q.   How do you make mistakes in reports?

A.   Grammical [sic] mistakes without spell check, yeah.

Q.   No I'm talking about factual mistakes, important factual mistakes.

A.   Not too often.

Q.   Not too often.  You consider yourself a good officer.

A.   Yes, sir.

Q.   On this night you were a good officer.

A.   Yes, sir.

Q.   But yet in your report you don't have any indication that the bullet exited the interior of the car door.

A.   It's not in the report, no, sir.

Q.   So is it safe to say that you did not observe an exit point in the car door.

A.   It's safe to say that I didn't put it in my report.

Q.   But if you would have saw it you would have put it in your report, unless you made a mistake.

A.   Unless I mistakenly forgot to put it in there.

Shortly thereafter, another pertinent colloquy occurred:

Q.   . . . Let me ask you this.  Now when you examined the car was [sic] there any holes in the windows?

A.   I didn't notice any holes in the windows.

Q.   If you would have noticed them you would have put it in your report.

A.      Yes, sir, I would of [sic].

Q.      While examining the car you opened the car door, correct?

A.      Yes.

Q.      Was there any broken glass inside the car?

A.      I didn't notice any broken glass.

Q.      And if you had noticed it you would of [sic] took [sic] a picture of it.

A.      Yes, sir.

Q.      Now there's testimony based on the pictures you've taken, those pictures you're looking at right now, if there's been testimony that the window of this car was rolled completely down, is it safe to say that based on your pictures that the bullet would have to pass also through the window.

A.  Correct.

During the redirect examination, the State elicited the following exchange:

Q.      Officer Matthews, I think you're looking at that exhibit.

A.      Yes, sir.

Q.      And you testified that you have no knowledge whether that is an exit wound [sic] or not.

A.      No, sir.

Q.      I'm going to show you – and you have no knowledge what this white flaky material is right here, correct?

A.      No, sir.

Q.      And if there was testimony by Mr. Zachary that this was the interior kind of plastic area that the bullet passed through, you have no reason to dispute it.

A.      No, sir.

Q.      I'll show you Exhibit 11 of that same door, albeit a picture taken about three months ago. You agree that's in the same location as the damage on the earlier picture that you took, correct?

A.      Yes, sir.

Q.    Does that appear to be a hole to you?

A.    Yes, sir, it does.

Q.    And you're admittedly not a car mechanic, correct?

A.    No, sir.

Q.    Correct.  You're not an expert in window mechanisms and doors.

A.    No, sir.

Q.    I'll show you State's Exhibit 7.  You have no knowledge of how far this window comes forward in relationship to this hole to the left.

A.    No, sir.

Q.    Or whether that would have been in the path of this window if it was down.

A.    No, sir.

Q.    You have no knowledge of how far this window comes down in relationship to this bullet hole at the bottom of the door, correct?

A.    No, sir.

Q.    So you have no opinion or knowledge of whether this window was down completely or whether or not that hole or bullet would have caused damage, correct?

A.    Correct.

In the absence of specific measurements or expert testimony, the testimony given by Lt. Matthews did not present physical evidence that concretely negated the scenario recounted by the victim and the witnesses from his family.  Certainly, it did not rise to a level that would cause this court to second-guess the jury's assessments regarding the weight and credibility of the evidence.

As for the defense witnesses, Wyoletta Vital testified about events inside the reception hall, but did not see what happened in the parking lot.  Graylin Chevalier,

mentioned earlier, also stayed inside the reception hall during the incident. Both of these witnesses heard gunshots outside the hall but did not see the critical events take place.

Marcus Vital, a cousin of the victim, testified that after the victim and the defendant confronted one another in the reception hall, someone escorted the victim out of the building. Fearing the situation might escalate outside, Marcus told the defendant not to leave at the same time. He exited the building with the defendant, but as soon as they got to the defendant's car, the victim opened fire. The victim then retreated to his car but was still outside it when the defendant retrieved a weapon from his car and returned fire. Initially, Marcus characterized the defendant's action as "retaliation." In his statement to police, he characterized the defendant's action as "self-defense."

Cassandra Archangel, the mother of the defendant's girlfriend, testified about the confrontation inside the reception hall and the victim's ejection, but she did not witness the men's actions outside.

Michael Vital, the victim's cousin, testified that when the defendant and the victim confronted each other inside, he helped Craig push the victim outside. Other people at the reception wanted the defendant ejected also, but Michael thought making them leave at the same time would just lead to more trouble outside. He said he saw the victim fire a weapon outside, so he approached the victim's mother and father "and told them to go get their son." The victim fired into the air three or four times while the defendant was still in the building. Also, Michael testified that the victim's mother and sister did not go outside before the shooting at issue. According to Michael, when word came that the victim had been shot outside, his sister fainted in the reception hall. However, on cross-

9

examination he acknowledged that the victim's mother could have gone outside after he talked to her, and he noted that he did not see when the defendant went outside. Michael did not witness the shooting incident at issue.

As mentioned earlier, the defendant testified on his own behalf. He stated that after the confrontation inside the reception hall, Craig pushed the victim outside. After that, other people asked the defendant to leave also, but Michael and Marcus prevented him from taking the same exit as the victim had. He walked outside with Marcus and heard a gunshot. Once he got to his car he retrieved a weapon from inside it. When he saw the victim point a firearm at him, he fired three times.

Investigators found three cartridge casings matching the defendant's weapon at the scene but none matching the victim's. The victim's weapon had a full magazine but no round was in the chamber. His ammunition box had a one-hundred round capacity; nineteen bullets were in it. Testing could not determine when the victim's weapon was last fired. The defendant acknowledged the victim did not fire at him.

While the various witnesses gave conflicting testimony, there is no reason for this court to second-guess the jury's determination regarding credibility. "A trier of fact may accept or reject the testimony of a witness in whole or in part." *State v. Ware*, 06-1703, p. 9 (La. 6/29/07), 959 So.2d 459, 464. Not only the state's witnesses, but also defense witness, Marcus, supplied the jury with sufficient evidence to determine that the defendant did not act in self-defense. Therefore, the assignment lacks merit.

## ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, the defendant argues the trial court erred by finding that he failed to establish a prima facie case of discrimination in the state's use of peremptory challenges, pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986). However, he states the record does not contain any information regarding the racial makeup of the venire or of the jury that was ultimately selected. Therefore, he requests that this case be remanded to the trial court so that the record can be developed in regard to the *Batson* issue.

There is no bright-line rule regarding how to establish such prima facie discrimination. "The [Supreme] Court did not formulate any particular requirements for determining whether a defendant established a prima facie case. Rather, the Court expressed confidence in the trial judges' ability to determine the establishment of a prima facie case." *State v. Sparks*, 88-17, p. 40 (La. 5/11/11), 68 So.3d 435, 470. The supreme court has stated the general test as follows:

> [T]he Supreme Court further clarified its *Batson* analysis with regard to *Batson's* first step in *Johnson v. California*, 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005), and its analysis of *Batson's* third and final step in *Miller-El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Our review of the defendant's claim is informed by the Supreme Court's pronouncements in *Johnson* and *Miller-El*.
>
> *Johnson* reiterated that "a prima facie case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.' " *Johnson*, 545 U.S. at 169, 125 S.Ct. 2410, *citing Batson*, 476 U.S. at 94, 106 S.Ct. at 1712. In *Johnson*, the Supreme Court quoted *Batson's* explanation of what constitutes a *prima facie* case:
>
> > [A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory

challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts *and any other relevant circumstances* raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. *Id.*, at 96, 106 S.Ct. 1712 (citations omitted) (quoting *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 97 L.Ed. 1244 (1953)). (Emphasis supplied).

*Johnson*, 545 U.S. at 169, 125 S.Ct. 2410.

. . . .

*Johnson* makes clear that the burden *of production* in the first *Batson* step is squarely on the defendant.

*State v. Draughn*, 05-1825, pp. 24-26 (La. 1/17/07), 950 So.2d 583, 602-03, *cert. denied*, 522 U.S. 1012, 128 S.Ct. 537 (2007) (footnote omitted).

The defendant cites *State v. Holand*, 10-325 (La.App. 4 Cir. 4/18/11), 64 So.3d 330, for the action he requests. It is distinguishable, however, because in that case the record contained more detailed information than the present record. We note the following discussion:

Our review of the trial court's decision is hampered not only by the lack of numerical data regarding the composition of the venire and jury, but also by the district court's failure in its rulings and observations to provide guidance. The colloquy between the district court and defense counsel, quoted above, suggests that the district court may have denied Mr. Holand's *Batson* (or *J.E.B.* [*v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419 (1994)])[3] challenge because the State utilized one of its eleven challenges to strike a Caucasian male prospective juror. Standing alone, this fact is insufficient to establish that Mr. Holand failed to make a *prima facie* case of discriminatory intent. Furthermore, the district court's general observations that the jury was composed of "numerous people of numerous races and numerous genders" and that there were "cross gender jurors" offers little guidance. For guidance, we turn to the recent jurisprudence on this issue.

The Louisiana Supreme Court in *State v. Myers*, 99-1803 (La.4/11/00), 761 So.2d 498, addressed a situation in which the trial court declined to address a defendant's *Batson* challenge. The defendant argued that his equal protection rights were violated after

---

[3] *J.E.B.* extended *Batson* to other "suspect classifications," such as gender.

the State used its peremptory strikes to exclude six African-American potential jurors from the venire in a discriminatory manner, but the trial court failed to rule on the *Batson* challenge. The record reflected that the first panel of jurors called included three African-American jurors. One African-American juror was selected, and the State used two peremptory challenges to exclude the remaining two. The second panel of jurors contained two African-American venire members, both of whom were excused by the prosecution with peremptory challenges. During the selection process, defense counsel put the trial court on notice that he questioned the peremptory strikes being made by the State; however, the trial court treated the defendant's objections dismissively and never issued a ruling on the issue of whether the defendant had established a *prima facie* case.

The Supreme Court in *Myers* held that the trial court's failure to rule on the *Batson* issue raised serious equal protection issues and that the specter of racial discrimination could not be discounted because of the trial court's failure to rule. Furthermore, because the trial judge had recently died, the option to remand for a hearing on the defendant's showing of a *prima facie* case was not available; the Supreme Court explained that "without the presence and participation of the trial judge, a meaningful hearing on the issue [was] all but impossible." *Myers*, 99-1803 at pp. 6-7, 761 So.2d at 502-03. Accordingly, the Supreme Court reversed the defendant's conviction and remanded for a new trial.

A similar issue was addressed by the Louisiana Supreme Court in *State v. Givens*, 99-3518 (La.1/17/01), 776 So.2d 443. In that case, the defendant claimed that the State impermissibly struck potential male jurors because of their gender in violation of *J.E.B.* The jury impaneled in *Givens* consisted of one man and eleven women. The record reflected that the defense struck a total of nine women and two men, and the prosecutor struck a total of seven women and six men. During the voir dire, the defendant objected to the State's use of peremptory strikes against men on four separate occasions. On each occasion, the trial court denied the objection and declined to require the prosecutor to provide reasons for any challenges it exercised against potential male jurors. Because the trial court did not articulate its reasons for denying the defendant's *J.E.B.* challenges, the Supreme Court noted that it was unable to review the trial court's reasoning. The Supreme Court further noted that a similar situation was presented in the *Myers* case, discussed above, in which the trial court failed to rule on the *Batson* issue.

Despite the lack of any guidance from the trial court, the Supreme Court in *Givens* concluded that the defendant presented enough evidence to establish a *prima facie* case of purposeful gender discrimination. The Supreme Court reasoned as follows:

13

Similar to *Myers*, there is no obvious reason for the prosecutor's strikes in this case other than gender. The defendant has presented enough evidence to establish a *prima facie* case of purposeful discrimination based on the fact that the prosecutor struck six male jurors for no apparent reason, three of whom were backstruck after being accepted by the defense, with the resulting jury composed of eleven women and one man. These facts evidence a pattern of strikes against male jurors and a disparate impact on the final composition of the jury. Therefore, the trial court should have required the prosecutor to offer gender-neutral explanations for the strikes.

*Givens*, 99-3518 at p. 8, 776 So.2d at 451. The Supreme Court thus remanded for an evidentiary hearing at which the trial court was instructed to allow the prosecutor to provide gender-neutral reasons for the strikes (step two) and to make a final determination of whether the defendant met his burden of proving purposeful discrimination (step three).

Another case in which the Louisiana Supreme Court reversed a trial court's finding that the defendant failed to establish a prima facie case of discriminatory purpose (step one) is *State v. Drake*, 08-1194 (La.1/30/09), 2 So.3d 416. In *Drake*, the Louisiana Supreme Court noted:

The trial court found that defendant had failed to satisfy the first step in the three-part test of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) because he did not make a *prima facie* showing of discriminatory purpose. However, the Supreme Court "did not intend the first step to be so onerous that a defendant would have to persuade the judge-on the basis of all the facts, some of which are impossible for the defendant to know with certainty-that the challenge was more likely than not the product of purposeful discrimination." *Johnson v. California*, 545 U.S. 162, 170, 125 S.Ct. 2410, 2417, 162 L.Ed.2d 129 (2005). A defendant "satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Id*.

*Drake*, 08-1194 at pp. 1-2, 2 So.3d at 417. In *Drake*, the State utilized its first eight challenges against African-American jurors. The Court's analysis was as follows:

In the present case, the state excluded peremptorily eight out of the 10 eligible African-American jurors called for

examination after the court excused seven other African-American jurors for cause. As a result, and even accounting for the state's selection of two African-American jurors for the panel, one of whom the defendant then struck, Caucasian jurors were significantly overrepresented on the panel in comparison to their number in the overall tally of jurors called for examination, and African-American jurors were grossly underrepresented.

These circumstances give rise to a reasonable inference of discriminatory purpose, although they might not support a finding that more probably than not race played a role in the state's exercise of its peremptory challenges. *Johnson* expressly cautioned that "[t]he *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process. . . . The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." *Johnson*, 545 U.S. at 172, 125 S.Ct. at 2418.

*Drake*, 08-1194 at p. 2, 2 So.3d at 417. The Louisiana Supreme Court thus remanded the matter to the district court to provide the State with an opportunity to offer race-neutral reasons for the exercise of its peremptory challenges (step two) and for a ruling by the trial court on the question of whether race played a role in the selection of defendant's jury (step three).

Finally, in *State v. Maxwell*, 08-1007 (La.App. 4 Cir. 8/19/09), 17 So.3d 505, this court reversed a defendant's conviction after the State used nine of its twelve peremptory challenges to exclude African-Americans from the jury and exercised cause challenges only against African-American venire members. Ultimately, the jury impaneled consisted of ten Caucasians and two African-Americans, which this court noted was not reflective of the population of the Parish of Orleans in which the case was tried. Although the State offered race neutral reasons for the exercise of five of its peremptory challenges, the trial court did not require the State to offer reasons for the first four challenges that it exercised. Concluding that the defense established a *prima facie* case of discriminatory intent on the State's part, this court reversed the defendant's conviction and remanded for a new trial. However, the Louisiana Supreme Court reversed this court's decision in part—to the extent that this court outright reversed the defendant's conviction—and remanded for further proceedings as in *Drake*, *supra*. *State v. Maxwell*, 09-2235 (La.4/16/10), 33 So.3d 155.

15

Although on this record in this case we are unable to accurately assess what impact the State's exercise of its peremptory challenges had on the composition of the jury ultimately impaneled, we conclude that the State's use of ten of its eleven peremptory challenges to strike African-Americans—nine of whom were women—was sufficient to establish a *prima facie* case of discrimination—racial, gender, or both. These numbers alone were sufficient to establish at least "the inference" that discrimination had occurred. *Johnson v. California*, 545 U.S. 162, 170, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005); *see also Saunders v. Tennis*, 720 F.Supp.2d 682, 691 (E.D.Pa.2010)(noting that "[a] pattern showing eight of nine peremptory strikes on African-American women is 'certainly strong enough to suggest an intention of keeping [African-Americans] off the jury.' ") We thus find, contrary to the trial court's conclusion, that Mr. Holand established a *prima facie* case of discrimination.

Given our finding that Mr. Holand satisfied step one, we, as the Supreme Court did in the line of cases discussed above, remand to the district court to allow the State an opportunity to offer race (and gender) neutral reasons for its strikes (step two), and for the district court thereafter to issue a ruling on whether race (or gender or both) played a role in the selection of the jury (step three). In the event of an adverse ruling on the *Batson* (or *J.E.B.*) issue, Mr. Holand may file another appeal.

*State v. Holand*, 64 So.3d at 336-39 (footnotes omitted).

Thus, *Holand* and the cases it relied upon had more detailed records available to them. In each of those cases, it was clear the state had used a high proportion of its peremptory challenges against African–American venire members, or there was a racial imbalance in the jury's final composition. The defendant appears to concede the current record does not contain enough information to determine whether he presented a prima facie case that the state's peremptory challenges had been used in a racially discriminatory manner. Thus, the present case does not meet the threshold of *Holand* and the cases cited therein. All of those cases addressed situations in which the prima facie pattern was apparent.

In the present case, the following colloquy occurred:

BY MR. DANIELS:

Your Honor, I'm going to raise a Batson challenge.

BY THE COURT:

Okay. Tell me about it.

BY MR. DANIELS:

Well, I think Mr. Duhe, in the first panel he struck -- in this panel alone he struck two black, two African Americans, Miss Hill will be the third. In the last panel he struck another African American.

BY THE COURT:

So that's five African Americans that he has struck.

BY MR. DUHE:

I don't see that.

BY MR. DANIELS:

Hang on one second let me grab.

BY MR. DUHE:

On the first panel I see Mr. Sam and I struck -- and I accepted, Mr. Hall was the second one on the second panel. I accepted two African Americans on the first panel. My second strike was Mr. Hall. Okay, I'm going to let him make his prima facia [sic] case.

BY THE COURT:

I'm not seeing it at this time.

BY MR. DANIELS:

I'm saying on this panel alone he struck two, I think Miss Boutte's African American.

BY MR. DUHE:

Who?

BY THE COURT:

Who?

17

BY MR. DANIELS:

Miss Boutte, on the far end.

BY MR. DUHE:

I have her down as white female.

MR. MR. DANIELS:

Miss Boutte on the far end to the top row.

BY THE COURT:

I don't know if we do DNA or what, but I wouldn't know she is black.

BY MR. DANIELS:

Well, I think she is African American, I think.

BY MR. WASHINGTON:

Well, we can ask her if she is.

BY THE COURT:

I'm not going to ask her.

BY MR. DANIELS:

Well, I think, I'm making a Bat[s]on challenge. He struck, one, two, three, four, five, six, seven, eight, nine. If he struck three African Americans, I'm saying my position is she is African American. He struck at least one-third of the African American jury venire men on this panel, thus far, just counting the first nine. The first nine people that's been tendered, he struck one-third of them.

BY MR. DUHE:

The first nine on what panel?

BY MR. DANIELS:

The first nine jurors that's been tendered to the State on this panel right here.

BY THE COURT:

He struck Miss Kraft.

18

BY MR. DANIELS:

He struck Mr. Hall, Brock Hall.

BY THE COURT:

Miss Kraft, obviously white person.

BY MR. DANIELS:

I'm saying he struck Mr. Hall. His second strike was Mr. Hall.

BY THE COURT:

Right.

BY MR. DANIELS:

He's African American. Can we all agree on that?

BY THE COURT:

Yes.

BY MR. DANIELS:

His next strike is Miss Boutte. My contention is she's African American. His contention is she's not. I'm saying she is. Third strike, his third strike is Miss Hills, she's obviously African American. That is one-third of the first nine venire --

BY THE COURT:

I don't find that you're making a prima facia [sic] case at all.

BY MR. DANIELS:

How I'm [sic] not?

BY MR. DUHE:

And just for the record, Judge, he's looking at one panel in a vacuum, he's not considering the first panel where there was only one African American that was struck, I accepted two of them.

BY THE COURT:

The ruling is I don't find a prima facia [sic] case.

19

BY MR. DANIELS:

Just note my objection that I made the Batson challenge.

The defendant gives no indication that he made any attempt to obtain supplemental materials, such as jury challenge sheets, that might have clarified the record. The defendant failed to present the evidence necessary to make a prima facie case that peremptory challenges were used in a racially discriminatory manner as is required. For the reasons discussed, the assignment lacks merit.

## ASSIGNMENT OF ERROR NUMBER THREE

In his third assignment of error, the defendant argues the trial court erred by refusing to allow the jury to view the victim's vehicle. He argues it is difficult to tell from the pictures in evidence whether a bullet passed through the victim's car door. As noted in the earlier *Jackson* review, Michael The victim testified a bullet passed through the door and struck him in the leg.

As the defendant points out, the governing statute is La.Code Crim.P. art. 762, which states:

> Sessions of court shall be held at the parish courthouse and, if there is more than one courthouse in a parish, sessions may be held at any such courthouse, or sessions may be held at places within the parish other than the courthouse or courthouses in the discretion of the court:
>
> . . . .
>
> > (2) To allow the jury or judge to view the place where the crime or any material part thereof is alleged to have occurred, or to view an object which is admissible in evidence but which is difficult to produce in court. At this view, the court shall not permit the taking of evidence except in connection with the place or object;
> > . . . .

A trial court's ruling on this issue is subject to review for abuse of discretion. *State v. Gallow*, 338 So.2d 920 (La.1976).

20

A sister circuit explained:

> In Assignment of Error No. 10, the defendant asserts that the trial court committed prejudicial error in denying his motion to view scene. The grant or denial of a motion to have the trier of fact view the scene of the crime is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. LSA-C.Cr.P. Art. 762(2); *State v. Sweeney*, 443 So.2d 522 (La.1983); *State v. Moore*, 432 So.2d 209 (La.1983).
>
> In the instant case the jury was presented with numerous photographs and heard extensive testimony detailing the scene of the crime. The photographs clearly reveal the interior layout of the residence as well as the front exterior of the apartment. They further reveal the relationship between the living room window and the back door. After reviewing the photographs and testimony, we find no abuse of discretion in the trial court's denial of defense counsel's motion.

*State v. Carney*, 476 So.2d 364, 370-71 (La.App. 4 Cir. 1985).

Similarly, in the present case numerous photographs were introduced into evidence, and it is not clear how a viewing of the vehicle would have supported the defendant's contention that some photographs were altered "to make it look like a bullet passed through the door." Also, the defendant had an alternative means of physically presenting the door, but he apparently made no attempt to have it removed and entered into evidence, nor did he have photographs or video taken to illustrate his point.

For the reasons discussed, we cannot say the trial court abused its discretion on this issue.

## ASSIGNMENT OF ERROR NUMBER FOUR

In his final assignment of error, the defendant argues that his nine-year sentence for aggravated battery is excessive. The controlling statute provides for a maximum sentence of ten years. La.R.S. 14:34.

This court has explained the analysis for such a claim:

21

We have set forth the following standard to be used in reviewing excessive sentence claims:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-0838 (La.2/1/02), 808 So.2d 331 (alteration in original).

In order to decide whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, we have held that:

> [A]n appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00), 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96), 674 So.2d 957, 958.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-0562 (La.5/30/03), 845 So.2d 1061.

In *State v. Whatley*, 06-316 (La.App. 3 Cir. 11/2/06), 943 So.2d 601, *writ denied*, 06-2826 (La.8/31/07), 962 So.2d 424, we discussed the factors that a reviewing court should consider in determining if a trial court abused its discretion in imposing a sentence. In *Whatley*, citing *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57, *writ denied*, 99-0433 (La.6/25/99), 745 So.2d 1183, we annunciated three factors that a reviewing court should take into consideration in abuse of discretion cases: (1) the nature of the crime; (2) the nature and background of the offender; and (3) the sentence imposed for similar crimes by the same court and other courts.

*State v. Morain*, 07-1207, pp. 4-6 (La.App. 3 Cir. 4/2/08), 981 So.2d 66, 69-70.

The trial court gave the following reasons at sentencing:

BY THE COURT:

The Court is well familiar with the facts as they were related and found by the jury [and] has reviewed the criminal history, as well as, the victim impact statement.

The Court feels that a hard labor sentence is warranted in this case having heard the evidence and will impose a sentence of nine years at hard labor with the Department of Safety and Corrections, with credit for time served on this case only if any time was served on this case. In reaching that sentence the Court takes into consideration the sentencing guidelines and particularly the feeling that this was a situation which didn't have to happen, it was with a weapon that the weapon was fired at someone, someone was hit by the bullet, they suffered an injury and that a lessor [sic] sentence than this would deprecate the seriousness of the offense and that this would not be the kind of case that would be appropriate for a suspended sentence or any less sentence.

Mr. Blount, you have a right to file a Petition for Post-conviction Relief if you think anything was done illegally or in violation of your rights and if you chose to do that you have two years from the date the judgment becomes final. Good luck, Mr. Blount.

In sentencing the defendant, the trial court noted that it knew the facts of the case and believed the crime "didn't have to happen." We further observe a number of facts that justify the trial court's sentence under the *Whatley*, 943 So.2d 601, criteria. First, the defendant went into a wedding reception with a handgun, stopped the victim, and showed the victim his gun in a threatening manner. After

23

this occurred, Craig and other attendees at the reception attempted to prevent a confrontation from occurring between the men. He separated the two men when their paths crossed at the reception and escorted the victim out of the reception to his vehicle. At the same time, other attendees attempted to keep the defendant inside the reception. The defendant, however, refused to heed their advice and remain where he was. Instead, he left the reception and followed the victim, shooting his gun as he did so. When the defendant shot at the victim, Craig was in the car with him. Moreover, the victim's mother, sister, and uncle were in close proximity to the victim as the defendant began shooting. Mrs. Zachary was standing next to his car, telling him to leave when shots were fired.

Second, although the trial court did not specifically identify the nature and background of the defendant, it stated that it reviewed the defendant's criminal history. We recognize that documentation of the defendant's criminal history is not the record, but do not find this alone constitutes error in light of the remaining *Whatley* factors.

Third, with regard to sentences imposed for similar crimes by this court and other courts, we note that in *State v. Hawkins*, 95-28 (La.App. 4 Cir. 3/29/95), 653 So.2d 715, a maximum ten-year sentence for aggravated battery was affirmed. The trial court related the facts which indicated the defendant shot the victim after the two were involved in a vehicular accident, and the defendant shot two clips of ammunition at the victim's van, injuring the victim. No reference was made to the defendant's criminal history. In *Hawkins*, two passengers were in the van when the defendant shot at it.

In *State v. Munoz*, 575 So.2d 848 (La.App. 5 Cir.), *writ denied*, 577 So.2d 1009 (La.1991), a ten-year maximum sentence was also affirmed, although the

seventeen-year-old defendant was a first offender due to the circumstances under which the crime was committed. The defendant approached the victim and three other teens as they were visiting outside a theater and proceeded to violently kick the victim until he was unconscious.

The defendant's actions in this case were as bad as, or worse, than the defendants' actions in *Hawkins* and *Munoz*. Here, the defendant endangered the lives of many more people than did the defendant in those cases. Importantly, he went to a large gathering of people with a gun and confronted the victim in the crowd with his gun. He then ignored the attempts of others to prevent an altercation. When the victim was led from the reception, the defendant pursued him, shooting as he approached the victim's vehicle, although the victim's mother stood near the car talking to the victim and his sister and uncle were in close proximity to Mrs. Zachary. For these reasons, we find no error with the trial court's sentence.

## DISPOSITION

The defendant's conviction and sentence are affirmed.

**AFFIRMED.**